## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUPERIOR COURT
                                                      Civil Action No.

| | |
|---|---|
| FELIX G. ARROYO,<br>　　　Plaintiff,<br><br>　　　v.<br><br>CITY OF BOSTON AND<br>MARTIN J. WALSH<br>*Mayor of Boston,*<br>　　　Defendants. | RECEIVED<br><br>AUG 2 1 2020<br><br>SUPERIOR COURT-CIVIL<br>MICHAEL JOSEPH DONOVAN<br>CLERK/MAGISTRATE |

## COMPLAINT AND JURY DEMAND

Plaintiff, Felix G. Arroyo ("Mr. Arroyo"), by and through counsel, hereby bring this

Verified Complaint and Jury Demand against the Defendants, City of Boston ("City"), and

Martin J. Walsh ("Mayor Walsh"), (collectively referred to as the "Defendants"), as follows:

## INTRODUCTION

1.    The Plaintiff, Felix G. Arroyo, brings this action against Defendants Mayor

Martin J. Walsh and the City of Boston to recover damages for the violation of his due process

rights, defamatory statements, unlawful employment practices, unlawful disclosure of private

and confidential information, and otherwise unlawful and wrongful conduct in connection with

Mr. Arroyo's service as the City's Chief of Health and Human Services.  As a result of the

Defendants' wrongful conduct, Mr. Arroyo has suffered personal injuries including reputational

harm, psychological injuries, pain and suffering, emotional distress, and impaired earning

capacity.  Mr. Arroyo seeks compensation for these losses.

1

## PARTIES

2.     Plaintiff Felix G. Arroyo is an individual residing in the City of Boston, Massachusetts.

3.     Defendant City of Boston is a municipality in Suffolk County, Massachusetts, and a public employer under G.L. c. 150E § 1, *et seq.* Its principal office is located at 1 City Hall Plaza, Boston, Massachusetts.

4.     Defendant Martin J. Walsh is, and was at all times relevant hereto, the Mayor of the City of Boston and in that capacity currently acts as the appointing authority for the City of Boston as that term is defined in M.G.L. c. 31. Mayor Walsh is sued in his individual and official capacity as Mayor.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to M.G.L. c. 258 §3.

6.     On September 19, 2017, Mr. Arroyo filed a Position Statement with the Massachusetts Commission Against Discrimination ("MCAD") in response to the Complaint filed with the MCAD by Hilani Morales ("Ms. Morales"), where Mr. Arroyo alleged that he was being treated unfairly and that he was being retaliated against. His claim was within the scope of the MCAD's investigation.

7.     The Plaintiff timely presented his claim in writing to Defendants through a Letter of Presentment, dated August 15, 2019, and properly served to Mayor Walsh, the executive officer of the City of Boston.

8.     Venue is proper in this Court in Suffolk County, as both parties are located therein.

## STATEMENT OF FACTS

9.      Plaintiff, Felix G. Arroyo, served as the Chief of Health and Human Services for the City of Boston from January 6, 2014 until he was wrongfully terminated on August 24, 2017.

10.     Mr. Arroyo had built a successful career in public service.  Prior to becoming the City's Chief of Health and Human Services, he dedicated over a decade of his life to public service and community organizing.  He worked to help pass the Affordable Care Act as the New England Field Director for Health Care for America Now and as an advocate for workers' rights as the Political Director for SEIU Local 615.  He was elected for two terms as a Boston City Councilor before launching a campaign for Mayor of Boston in 2013.  Mr. Arroyo was unsuccessful in his bid for Mayor, and concluded his service as an elected official in 2013.

11.     In an article published on June 22, 2010, the Boston Globe described Mr. Arroyo as receiving "a political education that began in grade school when his father worked at City Hall."  The article further describes his early accomplishments as a first-term City Councilor. "Those early civics lessons have given Arroyo the acumen to quickly establish himself as a significant presence. Not only was he integral to the resolution of the firefighters' contract dispute, he has been a vocal critic of a city plan to close libraries, he has promoted jobs and opportunity for youth, and he even managed to make himself a lightning rod in the national debate over illegal immigration."

12.     Following an election on Tuesday, November 5, 2013, Martin J. Walsh was elected as Mayor of Boston.

13.     After his election, Walsh offered Mr. Arroyo the cabinet-level position of Chief of Health and Human Services.  In that conversation, Walsh stated that he was offering the position as Chief of Health and Human Services to Mr. Arroyo for as long as he served as Mayor.  In that same conversation, Mr. Arroyo accepted the offer.

14.    Mr. Arroyo was Mayor Walsh's first appointment to his Cabinet.  Mayor Walsh publicly announced Mr. Arroyo's appointment the day before he was sworn into office.  In an article published by the Boston Globe on January 6, 2014, Mayor Walsh is quoted as saying: "Felix brings a wealth of knowledge and City of Boston experience to my administration.  Felix knows how to bring people together and work collaboratively.  He values and understands the importance of directly addressing the needs of Boston's most vulnerable residents, and he will have a huge impact on our city in this role."

15.    Walsh was sworn-in as the Mayor of Boston in January 6, 2014 to serve a four-year term of office.  Mr. Arroyo officially began serving in the position as the Chief of Health and Human Services on the same day.

16.    As Chief of Health and Human Services, Mr. Arroyo created the "Engage, Advocate, and Serve" cabinet-wide tagline and initiatives to improve access to existing City services, develop new policies, and to serve Boston's most vulnerable residents.  He led, created and implemented overall organizational strategic planning.  He brought together department heads and staff on a monthly basis to have Health and Human Services Leadership Team ("HHS") meetings that included guest speakers and created professional development opportunities.  Mr. Arroyo collaborated with public and private partners to advance initiatives, including those that promoted racial equity.  Mr. Arroyo developed and implemented a hiring toolkit to promote and increase diversity.

17.    Mr. Arroyo was a dutiful employee who earned a positive reputation.  On August 6, 2017, the Boston Globe published an article that reports: "Several City Hall staffers say he is a consummate professional who respects his staff and cares deeply about the city's most vulnerable residents and the city workers who serve them."

18.     According to the City's own response filed with the MCAD filed on October 4, 2017, it learned about allegations made against Mr. Arroyo on or about July 24 and 25, 2017, which was the first time it had learned of any allegation of sexual harassment involving Mr. Arroyo.

19.     Defendant, at all relevant times to these causes of action, maintained a policy manual, "An Employee Guide to Benefits, Rights and Responsibilities," hereinafter referred to as the City of Boston Employee Manual, which includes a policy on the disciplinary process that governs the discipline of employees in response to violations of work rules and regulations or inappropriate off-duty or on-duty employee behavior.  Exh. 1.

20.     On July 27, 2017, the City placed Mr. Arroyo on administrative leave pending an investigation into the allegations.  The Mayor's Chief of Staff, Dan Koh and Corporation Counsel, Eugene O'Flaherty informed Mr. Arroyo that he was placed on administrative leave orally and in writing.

21.     Mr. Arroyo denied all allegations of misconduct, and to date, has denied all allegations of misconduct brought forth in multiple, contradictory statements by Ms. Morales.

22.     In the July 27, 2017 letter addressed to Mr. Arroyo and signed by Corporation Counsel, the City stated that Mr. Arroyo had been placed on paid administrative leave "pending the City of Boston's investigation of a serious complaint including allegations of harassment and retaliation."  The City did not inform Mr. Arroyo that the allegations being investigated involved allegations of sexual harassment nor did the City provide notice of any of the specific allegations made against him.  The City denied Mr. Arroyo his right to know the allegations or of any evidence submitted or alleged and refused to even inform him of the source of the complaint.

23.     The July 27, 2017 letter also stated that during administrative leave, he was "prohibited from having contact with any City employees." This prohibition interfered with his right to present evidence.

24.     The July 27, 2017 letter further instructed Mr. Arroyo to "not take any action that could be perceived as retaliatory against anyone who may have information relevant to the City of Boston's investigation." The City explicitly states, "Engaging in such misconduct is prohibited and may be grounds for immediate termination of your employment."

25.     The City also demanded that Mr. Arroyo refrain from publicly commenting on the case.

26.     According to the City's response to the MCAD, "Upon receipt of the complaint, a decision was made to use outside counsel for the investigation into Complainants allegations against Mr. Arroyo." According to the City, "The investigation began immediately."

27.     The City's investigation was a sham from the beginning.

28.     The City hired Attorney Kay Hodge to conduct the investigation. Mr. Arroyo had no input in the selection of the investigator and was denied the opportunity to have an unbiased investigation. Attorney Hodge has represented the City against workers in numerous disputes before the Massachusetts Civil Service Commission and in the federal and state courts.

29.     On August 1, 2017, the Boston Globe published a story about Mr. Arroyo being placed on administrative leave based on a leak from City Hall. That alone created irreparable harm to his reputation and professional future.

30.     Mr. Arroyo, through counsel, repeatedly requested the details of the specific allegations and the source of the complaint in writing, but the City refused to provide it. Mr.

Arroyo's lack of notice about the complaint and its source leaving him the inability to defend himself and his public reputation.

31.   Rather than receiving information from the City, the press confirmed to Mr. Arroyo that the source of the complaint was a City employee, Hilani Morales.  On or around August 7, 2017, Mr. Arroyo received a press inquiry in which he learned that the press was aware of the specific nature and source of the complaint against Mr. Arroyo and was considering a story citing a City employee as a source.  Mr. Arroyo met all press inquiries with no comment because of the City's demand to refrain from public comment.

32.   On August 8, 2017, Attorney Hodge confirmed that the investigation was confidential, and the City would not be speaking with the press despite the fact that a City employee had already leaked details of the investigation that the City had withheld from Mr. Arroyo, to the press.

33.   Attorney Hodge requested to interview Mr. Arroyo.  An interview was arranged to take place on August 16, 2017.  Mr. Arroyo was never provided with a copy of the allegations against him and therefore denied the opportunity to respond to each allegation specifically or thoroughly prepare a defense.

34.   On August 14, 2017, Mr. Arroyo, through counsel, requested a copy of the City of Boston Employee Manual, the specific allegations against him and the name of any complainant, evaluations completed by HHS Leadership Team members of him as Chief of Health and Human Services, access to his work emails, and an affirmative answer in writing whether the City had expressed a desire or preference to fire him prior to the completion of the independent investigation.  Despite the City's refusal to fulfill his requests, Mr. Arroyo remained fully cooperative.

35.     On or around August 14, 2017, Mr. Arroyo also provided the investigator with the names and titles of 25 relevant witnesses, most of whom were women and members of the Health and Human Services Leadership Team who met with Mr. Arroyo on a monthly basis.

36.     On or around August 14, 2017, Mr. Arroyo through counsel, provided Attorney Hodge with relevant evidence, including evidence of text messages that his accuser had sent to another City employee making contradictory and inconsistent allegations against Mr. Arroyo during the investigation.

37.     Mr. Arroyo provided exculpatory evidence to Attorney Hodge that wholly disproves the differing version of allegations.

38.     The evidence provided also demonstrated that Ms. Morales was in contact with other City employees and was making efforts to manipulate the investigation including her desire to garner press.  The text messages included one that Ms. Morales sent on July 28, 2017, in which Ms. Morales stated that the City's Human Resources Department told her that they wanted Mr. Arroyo to resign, and Ms. Morales stated: "I want the media to find out."  Again, on August 1, 2017, Ms. Morales stated: "They want to fire Felix."

39.     According to the City, Ms. Morales had participated in an initial interview, but declined Attorney Hodge's request for a follow-up interview.

40.     On August 16, 2017, Mr. Arroyo willingly participated in the interview with the investigator.  The interview took place in the afternoon.  Mr. Arroyo denied all allegations of misconduct.

41.     The next morning, at 7:22 AM on August 17, 2017, Ms. Morales sent a message to the same co-worker involved in the text exchange provided to Attorney Hodge, saying, "You broke my heart.  Goodbye."  Later, that same day, on August 17, 2017, Ms. Morales filed a

MCAD Complaint, and then shortly after, shared the Complaint with the Boston Globe, as confirmed by the newspaper.  The Boston Globe also credits her with providing them with emails she received from Chief Dan Koh.

42.     The evidence demonstrably shows that the City provided Ms. Morales with access to opposing evidence and work emails, contact with City employees, and notice of the proposed termination of Mr. Arroyo, all of which the City refused to provide to Mr. Arroyo.  It also demonstrates clear bias against Mr. Arroyo during the investigation.

43.     The pattern of retaliation by his accuser against Mr. Arroyo went unchecked by the City.  The damage to Mr. Arroyo was exacerbated by the dissemination of information that was presented as a confidential investigation.

44.     On August 21, 2017, Mr. Arroyo through counsel provided Attorney Hodge with additional evidence that was both material and probative to the investigation.

45.     On or around August 21, 2017, Mayor Walsh told Mr. Arroyo that he did not believe Ms. Morales's allegations and would not fire Mr. Arroyo.

46.     On August 22, 2017, the Boston Globe published a story detailing the allegations by Ms. Morales that were contained in her MCAD complaint.

47.     On or around August 22, 2017, after the August 22, 2017 article in the Boston Globe was published online, the City's Corporate Counsel, Eugene O'Flaherty called Mr. Arroyo's attorney and said that Mr. Arroyo could resign or be fired.

48.     The City failed to protect the reputation of Mr. Arroyo.  In the August 23, 2017 article in the Boston Globe, Mayor Walsh is quoted as saying: "Nobody should have that feeling, [coming into] a hostile work environment. No one should ever have that," when asked generally about sexual harassment. "That's something that bothers me, particularly a woman, and I don't

want that happening in my administration."  Further, the City's communications chief, Laura

Oggeri, is quoted as saying: "These allegations are intolerable and disturbing.  We take the safety

and well-being of our employees very seriously and we are working to get to the bottom of this

as soon as possible."  Mayor Walsh and the City made these statement before any investigation

had been completed on what had transpired between Ms. Morales and Mr. Arroyo, if anything.

Further, by making about a hostile work environment and safety, it created the false impression

that Mr. Arroyo had created a hostile work environment and was dangerous.

49.     In the August 23, 2017, article in the Boston Globe, Lieutenant Detective Michael

McCarthy of the Boston Police Department and an agent of the City is quoted as saying that he:

"is attempting to contact the victim to see if she wanted to file a criminal complaint."  By making

this statement and referring to Ms. Morales as "the victim," the City prejudged Mr. Arroyo and

created among the public the impression that Mr. Arroyo was guilty of criminal conduct.  A

criminal complaint was never filed against Mr. Arroyo.

50.     On August 23, 2017, Mayor Walsh reiterated the threat to Mr. Arroyo to resign or

be fired.

51.     On August 23, 2017, Attorney Hodge requested that Mr. Arroyo meet with her the

to conduct a follow-up interview.  The nature and purpose of the interview had been described as

to ask a few additional questions in order to conclude their investigation.  Mr. Arroyo agreed to

participate in the follow-up interview.  The meeting was arranged for Friday, August 25, 2017.

52.     The City abruptly terminated Mr. Arroyo on Thursday, August 24, 2017 before he

had the opportunity to participate in the investigator's follow-up interview and before he had an

opportunity to fully defend himself.

53.     The investigation was a sham as Mayor Walsh and the City had already decided to terminate Mr. Arroyo's employment prior to the conclusion of the independent investigation as evidenced by the fact that Mr. Arroyo was threatened to resign or be fired the day before the investigator asked for a follow-up interview with Mr. Arroyo and before he was able to participate in the follow-up interview.

54.     Mr. Arroyo was never provided the opportunity to cross-examine adverse witnesses and was not even informed of what evidence was being used against him.  The City never provided Mr. Arroyo with names of the individuals that were interviewed during the process, and never provided him with transcripts of the interviews of witnesses conducted as a part of the investigation.

55.     Attorney Hodge neglected to interview favorable witnesses to Mr. Arroyo, including those who could provide highly relevant information.  Notably, one of the City employees that worked closely with Mr. Arroyo had affirmatively contacted the City to provide testimony as a direct witness to at least one of the alleged incidents, but he was never interviewed.  In a column published in the Boston Globe, Joan Vennochi described how through affidavits, city workers stated that they never witnessed any of the inappropriate behavior described in the MCAD complaint.  She notes how a City employee "who claimed to have a direct sight line into Arroyo's office [at the time that he was alleged to have grabbed his accuser by the neck], provides this account: 'The door remained open during their meeting, . . . I watched the entire conversation.  Felix's desk was between Felix and (the woman) the entire time.  He did not move from behind his desk and was never even within arm's length of her.  Felix never touched her.'"  Attorney Hodge never interviewed this City employee despite his affirmative request to be interviewed and despite his material and probative testimony.

11

56.     The City never provided Mr. Arroyo with a written findings of fact from the investigation.  Mr. Arroyo had to request a copy of the report prepared by Attorney Hodge from the Office of Attorney General.

57.     In her findings, Attorney Hodge found both Mr. Arroyo and Ms. Morales credible, despite Ms. Morales giving different versions of events and providing no evidence in support of her statements.  Attorney Hodge never informed Mr. Arroyo of the allegations against him or allowed him to call City employees as witnesses.  She allowed hearsay evidence to be used.  In her conclusions, she found that the City could be found liable if the matter went to court.

58.     The written findings made by Attorney Hodge do not consider or make reference to exculpatory evidence provide by Mr. Arroyo.  Further, it fails to consider all of the evidence provided, including evidence of Ms. Morales' intent was to ensure that Mr. Arroyo was fired from his post as Chief of HHS, that his reputation be irreparably damaged, and that he be publicly humiliated.  It fails to even mention the multiple, inconsistent versions of the allegations provided by Ms. Morales during the course of the investigation.  It also fails to consider evidence of past allegations made by Ms. Morales against other individuals or disclosure of personal information to other members of the HHS team that challenges the credibility of her allegations, including evidence of openly sharing with her co-workers: information about her drug use; the difficulties she experienced in her marriage; her divorce proceedings; her complaints about her husband missing a testicle; alleged mistreatment from her husband, her mother-in-law and her father; and, inappropriate aspects of her sexual life with her HHS co-workers, including visits to strip clubs and favorite sex toys.

59.     On October 4, 2017, the City responded to Ms. Morales's MCAD complaint and stated that they had no evidence that Mr. Arroyo did what was alleged in the complaint.

60.     On or around November 21, 2017, Ms. Morales withdrew her MCAD complaint. In March of 2018, Ms. Morales filed a civil complaint against Arroyo and the City, where she alleged sexual harassment and retaliation.

61.     At the time of his termination, Mr. Arroyo was the only Latino on the Mayor's Cabinet.

62.     In other instances where allegations of misconduct have been made against non-Latino employees, the City protected the confidentiality of the investigation and ultimately did not terminate employment of those employees based on the existence of allegations.

63.     With the knowledge that the City had no evidence that Mr. Arroyo had committed any acts of sexual harassment, as was the truth based on the City's own statement to the MCAD, Mayor Walsh characterized Mr. Arroyo's termination as the "appropriate step following an investigation 'concerning' complaint of sexual harassment.

64.     In the August 25, 2017 article in the Boston Globe, Mayor Walsh, before making the announcement of Mr. Arroyo's dismissal is quoted as saying: "I don't think we have fundamental issues with people [being] afraid to come forward with any type of . . . sexual harassment [complaint]." Mayor Walsh made these statements in conjunction with the termination of Mr. Arroyo without giving Mr. Arroyo an adequate opportunity to demonstrate that he had not committed sexual harassment and to clear his name.

65.     On August 25, 2017, the Boston Globe reported the Mayor Walsh said Ms. Morales's transfer was "for the woman's safety." Mayor Walsh's statements to the press implied that Mr. Arroyo was a dangerous person despite the fact that he had exculpatory evidence

13

proving the allegations were false and by the City's own admission, had no evidence of the
allegations being true.

66.     The City did not convey to the Boston Globe what it stated in its Position
Statement to the MCAD, that it had no evidence that Mr. Arroyo had done what was alleged by
Ms. Morales.  In spite of the City having no evidence that Mr. Arroyo did what Ms. Morales
alleged, the Mayor made the following statement to media: "If your daughter worked under Felix
Arroyo, you would want me to fire him too."

67.     Mayor Walsh and the City consistently told the press that Mr. Arroyo's
termination was based on the results of the internal investigation.  These statements are
demonstrably false as the decision to terminate Mr. Arroyo had been made prior to the
conclusion of the investigation.

68.     In the August 27, 2017 article, the Boston Herald reported that Mayor Walsh
made the call to fire Arroyo based on an internal probe.

69.     In the August 27, 2017 article, the Boston Globe reported that the City's
communications chief said in an email statement that he was terminated from the City of Boston
"after a comprehensive internal investigation."  This statement was reported by multiple media
outlets, including U.S. News and World Report, NBC Boston, CBS Boston, NECN, WCVB,
WBUR, Boston Magazine, the Bay State Banner, and the Dorchester Reporter.

70.     In a September 25, 2017 article published in the Boston Globe, the City's
communications chief is quoted as saying: "Arroyo, who was an employee at will, was
terminated after a comprehensive investigation that concluded Aug. 23."  Again, it was reported
in the February 23, 2018 article in the Boston Globe that: "The city said it terminated Arroyo
after it completed its own "comprehensive internal investigation" that started July 27 and

14

concluded Aug. 23." This is false. August 23, 2017 is the day that Attorney Hodge requested a follow-up interview of Mr. Arroyo in order to conclude the investigation. Mr. Arroyo was terminated before the follow-up interview took place.

71.     By falsely claiming that Mr. Arroyo's termination was the result of an investigation, Mayor Walsh's and the City's led to further harm to his reputation by creating the belief that the City had evidence of wrongdoing when, in fact, as the City later admitted in its MCAD response, it had no evidence that Mr. Arroyo had done what was alleged in the MCAD complaint.

72.     In the August 25, 2017, article published by WBUR, Mayor Walsh is quoted as saying: "Any time that we have any type of allegations in the city of Boston where there's somebody that feels threatened or concerned, we're gonna do an investigation and we're gonna take the proper action and that's what we did in this case." The clear implication is that Mayor Walsh and the City had evidence of wrongdoing, which is false.

73.     Mayor Walsh and the City made the statements alleged above with knowledge of, or in reckless disregard of their falsity.

74.     At all times relevant to the making of the statements alleged above, Laura Oggeri was an employee or agent of the City acting within the scope of her employment or agency.

75.     As reported in the Boston Globe in its August 25, 2017 article, "The termination derailed Arroyo's rapid rise in city politics." Having received a political education since he was a child, Mr. Arroyo's entire career and expertise has been developed in public service. The allegations and false statements made by the City have destroyed his reputation and thus his career, as was the intention of his accuser.

15

76.   Defendants' wrongful conduct likely will prevent Mr. Arroyo from returning to public service, where he has dedicated his entire career.

77.   The adverse publicity from Defendants' false statements and otherwise wrongful conduct has clearly had a severe impact on Mr. Arroyo's reputation and ability to pursue employment because, among other things, Defendants have publicly charged him with sexual harassment.

78.   Published statements demonstrate the harm caused by Mayor Walsh's and the City's statements and their withholding of the truth that the City had no evidence supporting Ms. Morales's allegations.

79.   In an article published in the Boston Herald on August 25, 2017, Boston City Councilor At-Large Annissa Essaibi George is quoted as saying on Herald Radio: "I am not privy to the findings of the investigation, but I trust that, if it lead to a termination, the findings must have been significant."

80.   In the August 25, 2017 article published in the Boston Herald, a political science professor is quoted as saying: "The only way I see this is a political loss is. . . if for some reason these allegations don't pan out, the rush to judgment would hurt [Walsh]. But I don't think he (Walsh) would do it lightly."

81.   In the October 11, 2017 article published in The Bay State Banner, State Representative Holmes is quoted as saying: "The fact that he was fired while facing harassment charges will damage his career. Even if he's found to be innocent, his reputation is substantially damaged."

82.   After his termination, Mr. Arroyo volunteered to move boxes in the office of the Suffolk County Probate and Family Court Registry, where his father serves as the Register of

16

Probate.  The Office of Human Resources of the Trial Court informed Register Arroyo that Mr.

Arroyo was prohibited from volunteering in the office due to the sexual harassment allegations

and resulting termination of Mr. Arroyo from the City of Boston.  The Office of Human

Resources of the Trial Court explicitly stated since Mr. Arroyo was terminated, the City must

have concluded that the allegations against him were true.

83.     A Google Internet search of Mr. Arroyo now produces the Defendants' various

defamatory statements, as a result of which those false statements are constantly and foreseeably

republished on a regular basis to Mr. Arroyo's personal and professional detriment.  For example,

a February 26, 2020 article in the Boston Globe reported: "Her allegations upended City Hall in

the summer of 2017, and derailed Arroyo's rapid ascension through Boston politics from a city

councilor to mayoral candidate and a member of Walsh's Cabinet."  The move, the city said, was

made to "ensure Ms. Morales's safety" and to avoid any interactions between her and Arroyo.

"A spokeswoman for the mayor said his office had no comment."  Mayor Walsh and the City

made no attempt to correct the record or disclose that the City has no evidence of Mr. Arroyo

committing any of the wrongdoing that was alleged in the MCAD complaint.

84.     As a result of being terminated, Mr. Arroyo lost, in addition to his compensation,

his health care insurance, dental care benefits, eye care benefits, and other benefits guaranteed to

him by the terms and conditions of his employment.

85.     As a direct and proximate cause of the results of the Defendants' conduct, Mr.

Arroyo has suffered physical, emotional, and economic injuries.

86.     Mr. Arroyo continues to suffer the harmful reverberations of Defendants'

statements and other wrongful conduct.

87.     Mr. Arroyo has and will continue to suffer monetary damages as a result of the irreparable harm to his reputation.

88.     Defendants are responsible for the harm that Mr. Arroyo has suffered and continues to suffer, and they must compensate him for these losses.

89.     On or about August 15, 2019, Plaintiff presented his claim pursuant to G. L. c. 258, § 4, by sending a letter by certified mail, return receipt requested, to Martin J. Walsh, Mayor of the City of Boston including a description of the claim and demand for relief (the "Presentment Letter").

90.     The City of Boston did not respond to the Presentment Letter and the parties did not otherwise reach a final settlement of this claim.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT

91.     The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

92.     The City of Boston Employee Manual constitutes a contract that is a limited property right.  The language contained in the City of Boston Court Employee Manual that describes the Court's disciplinary action process was a promise to the Plaintiff regarding any disciplinary action towards him.  This process was disseminated to the Plaintiff, who accepted these terms, which modified his at-will employment status with Defendant.  As an employee, Mr. Arroyo had every right to expect the disciplinary action process would be implemented in the process. The failure of Defendants to implement the City of Boston Court Employee Manual policies resulted in injury to Mr. Arroyo.

93.     Thereby, the procedures used to terminate Mr. Arroyo breached the contract of employment that existed between Plaintiff and Defendant and violated his due process rights. Defendants deprived Mr. Arroyo of his employment as the Chief of Health and Human Services, a constitutionally protected property and liberty interest, under color of law, without substantive and procedural due process of law, violating his rights under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

94.     Defendants denied Mr. Arroyo a meaningful and constitutionally sufficient hearing prior to terminating Mr. Arroyo's employment as the Chief of Health and Human Services thereby denying Plaintiff due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

95.     As a result of the unlawful conduct of Defendants, Mr. Arroyo suffered economic damages, including, but not limited to, lost wages, lost fringe benefits and lost earning potential. In addition to suffering economic damages, Mr. Arroyo has suffered severe physical and mental pain and suffering and damage to his reputation as a result of the Defendants' unlawful and discriminatory conduct.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants, Mayor Walsh and the City of Boston, jointly and severally, for violations of Plaintiff Arroyo's civil rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution as follows:

A.  That the Plaintiff be awarded back pay;

B.  That the Plaintiff be awarded compensatory damages;

C.  That the Plaintiff be awarded mental and physical pain and suffering damages;

D.  That the Plaintiff be awarded punitive damages;

E.   That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

F.   And for such other relief as this Court may deem just and proper.

## COUNT II – NEGLIGENCE

96.     The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

97.     Defendants Mayor Walsh and the City of Boston had a duty to Mr. Arroyo to exercise reasonable care in selection, retention, and supervision of the investigator that they hired to conduct the investigation.

98.     As set forth in the details above, Defendants Mayor Walsh and the City of Boston breached that duty.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants, for negligence as follows:

A.   That the Plaintiff be awarded seeks compensatory damages;

B.   That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

C.   And for such other relief as this Court may deem just and proper.

## COUNT III – DEFAMATION

99.     The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

100.    As set forth in detail above, Defendants Mayor Walsh and the City of Boston each published statements of and concerning Mr. Arroyo that they knew to be false, or in reckless disregard of their falsity. The statements were false, defamatory, and defamatory per se.

101.    In doing so, Defendants Mayor Walsh and the City of Boston held Mr. Arroyo up to public scorn and ridicule, and destroyed his good name and reputation. Despite being an

individual who takes great pride in his professional achievements and being an advocate and leader in the fight for social justice and promoting racial equity, the public and his current and future employers have been left with the false understanding that Mr. Arroyo has been violent and sexually harassed a co-worker.

102.    The consequences to Mr. Arroyo have been devastating. For example, a Google Internet search of Mr. Arroyo now produces the Defendants' various libels and slanders, as a result of which the Defendants' defamatory statements are constantly and foreseeably republished on a regular basis, all to Mr. Arroyo's personal and professional detriment.

103.    The published statements of and concerning Mr. Arroyo were defamatory per se because they imputed dishonorable conduct and criminal conduct to Mr. Arroyo, and because they injured Mr. Arroyo in his trade or business.

104.    All of the statements described above were false, malicious, and were published with a knowing, intentional, subjective awareness of, or in reckless disregard of, their falsity.

105.    As a result of Defendants' wrongful conduct, Mr. Arroyo's reputation has been gravely damaged.  His ability to obtain work in public service or politics has been obliterated. Mr. Arroyo has suffered significant damages, including damages to his personal and professional reputations and emotional distress and economic damages.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants, Mayor Walsh and the City of Boston, jointly and severally, for defamation as follows:

   D.   That the Plaintiff be awarded seeks compensatory damages;

   E.   That the Plaintiff be awarded mental and physical pain and suffering damages;

   F.   That the Plaintiff be awarded punitive damages;

   G.   That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

21

H.  And for such other relief as this Court may deem just and proper.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

106.    The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

107.    Based on the conduct alleged above, Defendants engaged in conduct intended to inflict emotional distress on Mr. Arroyo, or these Defendants knew or should have known that emotional distress was the likely result of their conduct.

108.    It was foreseeable that these actions would cause Mr. Arroyo to suffer significant emotional distress damages.

109.    Defendants' actions were extreme and outrageous, beyond all possible bounds of decency and intolerable.

110.    As a direct and proximate result of Defendants' wrongful conduct, and as alleged in detail above, Mr. Arroyo has suffered severe emotional distress of a nature that no reasonable person could be expected to endure and other damages.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded emotional distress damages;

C.  That the Plaintiff be awarded punitive damages;

D.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

E.  And for such other relief as this Court may deem just and proper.

## COUNT V – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

111.    The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

112.    As alleged above, Defendants Mayor Walsh and the City of Boston made defamatory statements about Mr. Arroyo with, at the very least, negligent disregard as to the falsity of those statements.

113.    As a direct and proximate result of Defendants' wrongful conduct, Mr. Arroyo has suffered severe emotional distress resulting in the physical manifestation of that emotional distress by objective symptomology and other damages.

114.    A reasonable person would have suffered emotional distress under the circumstances to which Mr. Arroyo was exposed.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded emotional distress damages;

C.  That the Plaintiff be awarded punitive damages;

D.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

E.  And for such other relief as this Court may deem just and proper.

**COUNT VI – MASS CIVIL RIGHTS ACT, CH. 12, SEC. 11H AND 11I**

115.    The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

116.    The named defendants, acting under color of law, have attempted to interfere by threats, intimidation or coercion, with the exercise or enjoyment of Plaintiff's rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the Commonwealth.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

B.  And for such other relief as this Court may deem just and proper.

## COUNT VII – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

117.    The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

118.    The contract between Plaintiff and the City of Boston included an implied covenant of good faith and fair dealing.

119.    The covenant of good faith and fair dealing required Mayor Walsh and the City of Boston to refrain from engaging in conduct that would destroy or injure Plaintiff's right to receive the benefits of his contract.

120.    Defendants deprived Plaintiff of the benefits of his contract and breached the implied covenant of good faith and fair dealing through its unlawful conduct described herein.

121.    As a direct and proximate result of the City's breaches of its contract with Plaintiff, Plaintiff suffered injury, harm and damages as described in Count I.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

C.  And for such other relief as this Court may deem just and proper.

## COUNT VIII – INVASION OF PRIVACY

122.    The Plaintiff repeats and re-alleges Paragraphs "1" through "90," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

123.    Defendants interfered with Mr. Arroyo's right to be free from unreasonable, substantial, or serious interference with his privacy.

124.    Defendants disclosed and disseminated confidential and private information relating to Mr. Arroyo.

125.    As a direct and proximate result of Defendants' violation of G.L. c. 214, § 1B, Mr. Arroyo has suffered significant damages, including economic damages, damages to his personal and professional reputations, and emotional distress.

WHEREFORE, Mr. Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded emotional distress damages;

C.  That the Plaintiff be awarded punitive damages;

D.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

E.  And for such other relief as this Court may deem just and proper.


**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

Felix G. Arroyo, Plaintiff

By his Attorney,

Anthony Ellison, Esq.
Law Office of Anthony R. Ellison
BBO# 567037
299 Gallivan Blvd.
Boston, MA 02124
Tel: 617-506-7057
Fax: 617-506-7175
arellisonlaw@gmail.com


Dated: August 21, 2020

## VERIFICATION OF COMPLAINT

I, Felix G. Arroyo, plaintiff in the above-captioned action, hereby verify that the allegations of fact stated in this complaint are true, with the exceptions of conclusions of law, which the Court will decide if these allegations support as a matter of law.

Felix G. Arroyo

DATE: 08/21/2020



# City of Boston

# Office of Human Resources

# An Employee Guide to Benefits,

# Rights and Responsibilities

Office of Human Resources
1 City Hall Square room 612
Boston, MA 02201

Martin J. Walsh, Mayor
Vivian Leonard, Director



## A Message from the Director of Human Resources

Dear City Employee,

As Director of Human Resources for the City of Boston, it's my pleasure to introduce this employee guide.

In choosing to work for the city of Boston you join a very diverse and talented workforce. There are over 17,000 of us and we work in more than 40 city departments. We are administrative personnel, childcare workers, library staff, firefighters, public works engineers, police officers, to name only a few occupations. We cross the spectrum of age, racial and cultural background, experience and education level. What strikes me most, however, is what we all have in common: we're all here to use our talents to enhance the quality of life for the citizens we serve.

Each of us has something special to contribute. In the Office of Human Resources, we're here to help you. This will give you a useful overview of what is both offered to you as a COB employee as well as what is expected of you. If there is any question or issue we can help you with, please call or visit us in Room 612 at City Hall, (617) 635-3370.

I am proud that you have chosen to work for this great City. You will find that you can make a good career here. By doing so, you play a very important part in enhancing the quality of life that keeps Boston a great city. Thank you.

Sincerely,

*Vivian Leonard*
Director, Office of Human Resources

# Table of Contents

**About this Guide**                                              **4**
      Disclaimer
**Helpful Resources**                                            **4**
      The Office of Human Resources
      Department Personnel Officer
      The HUB
      Official City Website
      Collective Bargaining Agreements
**Compensation**                                                 **6**
      Basic Compensation
      Salary Increases
**Additional Financial Benefits**                                **6**
      Direct Deposit Program
      Retirement Benefits
      SMART PLAN:  Deferred Compensation
      Credit Union
      MBTA Pass Program
      Flexible Spending
      Sick Leave Redemption Program
**Health and Wellness Benefits**                                 **9**
      Health Insurance Options
      Vision and Dental Benefits
      Pre Cancer Screening
      Sick Leave Bank
      Employee Assistance Program
**Holiday, Vacation and Personal Leave**                         **11**
      Holidays
      Floating Holidays
      Vacation Leave
      Requesting Vacation Leave
      Personal Leave
      Probationary Period
**Sick, Medical and Other Leaves**                               **13**
      Sick Leave
      Using Sick Leave
      Medical Appointments
      Medical Leaves
      Additional Leaves
**Important City Work Rules and Guidelines**                     **15**
      Hours of Work
      Alternative Work Schedule
      Attendance Policy
      No Smoking Policy

Revised 2015

Dress Code
E-Mail and Internet Use
Cell Phones and Personal Calls
Picture I.D. Cards
Use of City Equipment
Use of City Vehicles
Prohibited Behaviors
Off Duty Conduct
Adverse Weather Policy
Customer Service Policy
Sign Off on Work Rules

**Important Workplace Policies**                                18
Harassment Free Workplace Guidelines
Questions and Concerns about Workplace Harassment
Diversity Values
Ethical Conduct and Conflict of Interest Policy
The Americans with Disabilities Act
HIV/AIDS Policy
Zero Tolerance for Violence

**Professional Development & Continuing Education**              20
Tuition Reimbursement
Scholarship Opportunities
Training Workshops and Courses
Performance Review System

**Office of Labor Relations Policies**                           21
Grievance Procedure
Disciplinary Process

**Appendix:  List of Contacts**

For more information:  The HUB Document Library serves as a repository of the documents describing all of the City's employment policies and benefits in detail. Unless otherwise indicated, the benefits and policies listed in this guide are described in detail on the HUB, Document Library.

To access the HUB, click on the icon on the computer screen titled "the HUB."  Or type in this internet address.  https://hub.cityofboston.gov.  You will log on with your user ID and password and then choose Document Library.  For assistance with logging in to The Hub, call Hub Help at (617) 635-1HUB (1482) or send an e-mail to HubHelp@boston.gov

# About this Guide

## Disclaimer

This guide is informational only.  It provides a summary of benefits, rights and responsibilities for City of Boston employees.  Its provisions are not conditions of employment, and they may be unilaterally modified at any time with or without notice. This guide is not to be construed as a contract between the City of Boston and its employees.  Where collective bargaining agreements are in effect and such collective bargaining agreements come into conflict with any provisions in the is guide, collective bargaining agreements shall govern.

# To Find Out More:  Helpful Resources

In-depth information is available from the Office of Human Resources, department personnel officer, on the City's internal website, the HUB, and where applicable, the collective bargaining agreements.

## The Office of Human Resources

The City's Office of Human Resources handles payroll processing and compensation, health insurance, worker's compensation, City work policies and employee rights and benefits. It is located at City Hall, Room 612, (617) 635-3370.

## The Department Personnel Officer

Each department of the City has its own Personnel Officer.  The Personnel Officer is responsible for managing the human resource functions throughout each department. He or she assists with payroll and compensation issues, overseeing sick and other leave benefits and administering departmental rules and regulations.
A list of all departmental personnel officers is available by contacting the Office of Human Resources, (617) 635-3370.

## The HUB, the City of Boston Intranet

The City of Boston has its own website—for the internal use of its employees—called the HUB.  The HUB Document Library serves as a repository of the documents describing all of the City's employment policies and benefits in detail. At this site employees will also find important City updates, copies of their paychecks, request forms, special events and other useful information.  Unless otherwise indicated, the benefits and policies listed in this guide are described in further detail on the HUB's Document Library.

To access the HUB, click on the icon on the computer screen titled "the HUB."  Or type in this internet address.  https://hub.cityofboston.gov.  You will log on with your user ID and password and then choose Document Library.  For assistance with logging in to The Hub, call Hub Help at (617) 635-1HUB (1482) or send an e-mail to HubHelp@boston.gov

## Helpful Resources (continued)

### Official City Website

The official website for the City is www.cityofboston.gov.  On this website, employees can
- Does not do a weekly address-needs to be eliminated
- follow city events and
- look for cultural, recreational and entertainment opportunities

Employees and Boston citizens can also make on-line service requests for such things as fixing a broken street light, reporting a broken signal, reviewing a property tax bill and so on.  Visitors to this site can also make requests for service, and get information about questions or concerns by calling the Mayor's Hotline.  The number is (617) 635-4500 and representatives are there to help 24 hours a day, 7 days a week.

### Collective Bargaining Agreements

A high percentage of workers in the City belong to a union.  There are more than 30 unions in the city. If an employee is a member of a union, the contract may help determine the working conditions, and rights and benefits that govern the employee's employment. The collective bargaining agreements are found on the City of Boston website, www.cityofboston.gov/labor/agreements.asp.

Revised 2015

# Compensation

## Basic Compensation

Depending on the job group, employees of the City are paid either weekly or biweekly. With the exception of the Boston School Department, every employee gets his or her paycheck on Friday.

Employees complete a W-4 form that will authorize deductions, for example, single, married, etc.  Take home pay will vary depending on what deductions are selected.

The city is required to make certain deductions from the employee's paycheck.  These include:

Mandatory Deductions:  These are required deductions.

- Federal income tax
- State income tax
- The State/Boston Retirement Plan
- Union dues (when applicable)
- Federal Insurance Contributions Act/Medicare

Voluntary Deductions:  These may be authorized by the employee.

- Health Insurance
- Life Insurance
- Deferred Compensation
- Credit Union
- Charitable Deductions
- Flexible Spending

Central Payroll in Auditing can give an explanation of each of these deductions. They are located on the third floor mezzanine of City Hall at (617) 635-4161.

Employees should review paychecks to ensure accuracy and report any issues to the personnel officer.

## Salary Increases

The salary rate for an employee will increase once he or she has successfully completed one full year of service, unless the employee is at the top of the grade.  This will be reflected in the first paycheck following the anniversary date with the City.  Increases occur each year thereafter.  The amount of the increase is determined by the City and in some cases negotiated with the collective bargaining units.

Salary is only part of the total compensation.  City of Boston employees also receive a wide range of benefits, including health insurance and retirement.

# Additional Financial Benefits

## Direct Deposit Program

All employees participate in the City's direct deposit program.  With this benefit employees have a choice of having their paycheck deposited into checking, savings or NOW account, or the Credit Union each pay day.  The deposit can be split between two accounts as well.

Revised 2015

Forms are available on the HUB.  Or call or visit the Treasury Department at M-38 City Hall, (617) 635-4151.

## Retirement Benefits

Each week the city deducts a percentage of employee's wages toward retirement.  If an employee leaves before 10 years, he or she can opt to receive the money back, with interest, in a lump sum or leave it in the account until a later time.

If an employee works for longer than 10 years, he or she is vested, meaning that he or she is eligible for a City of Boston pension once the employee is eligible to retire.

The City does not participate in the Social Security system as private employers do. Vested employees who retire receive a monthly pension check from the City. Retirement benefits vary with start of service, number of years of service, and retirement age.

There are other retirement options as well and they are described in the City's Retirement Handbook.   The Retirement Board is located on the 8th floor of City Hall and answers questions at (617) 635-4305.

## SMART PLAN - Deferred Compensation

It's important to plan for some additional retirement income.  A tax-deferred savings plan, known as deferred compensation or the Smart Plan, is one of the best ways to do it.
Deferred compensation allows employees to save for retirement on a tax-deferred basis. Employees can defer (via payroll deduction) part of their annual salary each year.  No federal or state income taxes on contributions or accumulated earnings are paid until the funds are distributed, generally at retirement, when most people are in lower tax brackets. Funds may only be withdrawn from the Plan for a financial emergency, as determined by federal regulations, or upon retirement or termination of employment.   Smart Plan information can be found at http://www.mass-smart.com/ or by calling (877) 457-1900.

## Credit Union

The City of Boston Credit Union offers a plan to deduct a set amount each pay period from the employee's paycheck.

There are a number of savings plans to choose from, including the popular Roth IRAs.  The Credit Union provides checking accounts too as well as ATM and Debit Cards.  For additional information, call (617) 635-4545 or visit www.cityofbostoncu.com.  You can visit the Credit Union at several locations, including one in City Hall Room 242.

## MBTA Pass Program

The City encourages the use of public transportation.  Therefore, all employees who ride the MBTA can purchase the MBTA pass through a payroll deduction.   Each employee can purchase one pass each month.  The cost is deducted from the first paycheck of each month.  As an extra convenience, passes are handed out in the department the last week of the month.  Renewable passes are re-loaded each month automatically.  Forms are available through the personnel officer or on the HUB and are turned in for processing at Auditing/Central Payroll, Room 306 City Hall, (617) 635-3656.

## Flexible Spending

The Flexible Spending Account allows an employee to set aside a portion of his/her paycheck tax free to pay for such expenses as dependent care, medical/dental and prescription drug co-payments as well as public transit/parking. Additional information is available online or by contacting Health Benefits at (617) 635-4570 or visiting http://www.cityofboston.gov/ohr/benefits/fsa.asp

## Sick Leave Redemption Program

The sick leave redemption program is an incentive from the City to reward those with an excellent attendance record.  Employees can choose to participate in this program.
This Redemption Schedule shows how the payments are made.

| Days used | Cash Back |
|-----------|-----------|
| 0 | 5 day's pay |
| 1 | 4 day's pay |
| 2 | 3 day's pay |
| 3 | 2 day's pay |
| 4 | 1 day's pay |

Sick leave redemption is paid out in the early months of each calendar year, based on the previous year's attendance.

## Sick Leave for Part-Time Employees

Payment is based on number of scheduled days worked per week minus days used. Employees who did not work the entire year will receive a prorated amount.  Absences affecting amount of hours eligible to buy back include

- Sick (Paid)
- Sick (No Pay)
- AWOL
- Docked
- Sick Bereavement (sick used for extension of bereavement leave)
- Small Necessities Act (sick) Sick (Family)
- 40% of sick used for WC injury
- Sick (Maternal/Parental)
- Tardy/Unscheduled Absence (Unpaid)
- FMLA Sick
- FMLA (No Pay)
- Sick Pool

# Health and Wellness Benefits

## Health Insurance Options
Three health insurance plans are offered through the City.  They include:
- BCBS Blue Care Elect Preferred PPO
- Harvard Pilgrim PPO
- Neighborhood Health Plan HMO

Choosing a health plan is an important decision.  The descriptions of these plans are available on the HUB.   New enrollments or changes to existing health insurance plans can be made during the Annual Open Enrollment Period or following a qualifying life event, such as a marriage, birth of a child or loss of coverage.   Open enrollment runs from the beginning of April through the beginning of May each year.

The Health Benefits Office is located in Room 807 City Hall, (617) 635-4570.  Health Benefits Representatives are available in person or over the phone.  Health Benefits information is also available at http://www.cityofboston.gov/ohr/benefits/group.asp

## Vision and Dental Benefits
Dental/Vision benefits can differ depending on the employee's collective bargaining agreement.  Many City employees receive this benefit at no cost through the Massachusetts Public Employee Fund (MPE Fund.)  This benefit provides for such things as free vision exams, dental cleanings and low cost dental services and eyewear.

New employees become eligible for this benefit once they have completed six months of service with the City.  If you are eligible, you will receive an enrollment package from the MPE fund in approximately six months.  Employees must complete the form to indicate whether they would like the Network Plan or the Indemnity Plan. They must also indicate whether they would like to have an Individual or Family plan.  The booklet will inform you how to access services.

For questions about the MPE benefit plan, speak with your personnel officer.  Or call the Fund at (617) 367-6167.  http://www.mpefund.org/

A small number of employees may opt for a Dental/Vision plan through their Union; these include employees in the Boston Teachers Union, Boston Police Patrolmen's Association, Boston Police Superior Officers Association, Boston Police Detectives Benevolent Society, and the Boston Firefighters L718. Employees in these Unions should contact their Union representative directly for more information about these programs.

## Pre-Cancer Screening
All City of Boston employees may use up to four hours of paid time per calendar year for various types of cancer screening. A form is to be completed by the physician or health care practitioner conducting the screening and submitted to the Personnel Officer.  The form is located on the HUB.

## Sick Leave Bank

Employees may elect to participate in a sick leave bank, administered by the Office of Human Resources. An employee who has voluntarily donated one sick day per year to the bank, and who has exhausted all accumulated sick and other paid leave, is eligible to request a withdrawal from the sick leave bank.

## Employee Assistance Program

The City's Employee Assistance Program (EAP) is another health and wellness benefit. Trained clinicians help employees cope with personal problems such as those listed below. This unit can provide assessment, counseling and referral services. This benefit is free and it is completely confidential.  The EAP is available to employees and to members of their families.

If an employee or family member is experiencing any kind of difficulty impairing health and well-being or job performance, they can call (617) 635-2200.  The EAP is located at the China Trade Center, 2 Boylston Street, Boston.

These are examples of the types of issues are currently handled by the EAP:

- Grief, loss and change
- Anxiety and depression
- Eating disorders
- Anger management
- Domestic abuse
- Alcohol and drug use
- Financial concerns
- Stress management
- Gambling problems
- Parenting skills
- Job stress

# Holidays, Vacation and Personal Leave

## Holidays

Holiday time off is provided. A holiday schedule will be provided to you.

## Vacation Leave

Employees become eligible for vacation leave only after completing six months of employment.

Once vacation eligible, employees must work one day in the following year in order to use the vacation.

All City of Boston employees who successfully complete their probationary period and work at least 35 hours per week are entitled to full vacation leave benefits. Those employees who work 20 hours or more per week are entitled to vacation leave on a pro-rated basis. Employees may consult the personnel officer for details regarding the amount of vacation leave. Vacation leave use requires 48 hour notice.

## Vacation Leave for Mayor's Office Senior Managers

Vacation leave shall be calculated for Mayor's Office Senior Managers on each January 1st. A Mayor's Office Senior Manager who starts work before July 1st, and who actually works for six months, shall be entitled to one week of vacation before December 31st. An employee who starts work after July 1st shall receive one week of vacation leave upon the completion of six months of actual work. The department head may grant an additional week of vacation leave to such employees who were hired after July 1st and who have completed six  months of service.

A Mayor's Office Senior Manager who on January 1st has more than six months of continuous service, and up to fourteen years of service, shall receive four  weeks' vacation leave.

A Mayor's Office Senior Manager who on January 1st has more than fourteen years of service shall receive five weeks' vacation leave.

A Mayor's Office Senior Manager who on January 1st has more than thirty years of service shall receive six weeks' vacation leave.
The classification "Senior Manager" shall be determined by the Appointing Authority.

## Vacation Leave for Other Mayor's Office Employees

Vacation leave shall be calculated for all other Mayor's Office employees on each January 1st.  An employee who starts work before July 1st and who actually works for six months shall be entitled to one week of vacation before December 31st.
An employee who starts work on or after July 1st shall receive one week of vacation upon the completion of six months of actual work. The Department Head may grant an additional week of vacation leave to such employees who were hired after July 1st and who

have completed six months of service. An employee who on January 1st has more than six months of continuous service, but less than four years of service, shall receive two weeks of vacation leave.

An employee who on January 1st has more than four years of service, but less than nine years, shall receive three weeks' vacation leave.
An employee who on January 1st has more than nine years of service, but less than fourteen years, shall receive four weeks' vacation leave.
An employee who on January 1st has more than fourteen years of service shall receive five weeks' vacation leave.

## Requesting Vacation Leave
Vacation leave must be requested 48 hours in advance and the approval of the leave is contingent upon operational needs of the department.  That is so it will not cause undue interference with the department's operations. A maximum of ten days can be carried over into the new calendar year and must be used by December 31st.
Employees who have service in the state of Massachusetts, Suffolk County and some other types of public service may get credit towards vacation for that service.

## Personal Days
Employees are entitled to personal days following 6 months of employment.  Personal days is  time allotted to the employee that can be used for any reason, usually for unforeseen circumstances such as personal emergencies or tardiness.   The number of personal days varies according to job group and applicable collective bargaining agreements.
Unlike using a sick day, using a personal day does not impact participation in the sick leave redemption program.  Consult the personnel officer or the collective bargaining agreement for details regarding the amount of personal days your job group qualifies for.

## Probationary Period
No employee who has completed six (6) months of actual work shall be disciplined, suspended, or discharged except for just cause. Any period or periods during the first six (6) months of service for which an employee is not paid (including as little as one (I) hour) shall extend the probationary period by that amount of time. For the purpose of employees working on a less than full-time schedule, the probationary period will be considered complete after the employee has actually worked six (6) months  An employee who separates from service and is subsequently re-employed by the City of Boston shall serve a new six (6) month probationary period, except in cases of recall or reinstatement.

Any time off, while still on Probation, will be unpaid.

# Sick, Medical and Other Leaves

## Sick Leave

After six months of service employees will receive a lump sum of sick leave. Depending on the collective bargaining agreement, this is between 7 and 7.5 days.  Sick leave will accrue each week at a rate that is also determined by the collective bargaining agreement. Basically this amounts to about one day per month.  Check with your department personnel officer for the exact accrual rate.

Unused sick leave is carried over year to year.  Employees who carry over sick leave are ensuring that in the event of an injury or serious illness they will be covered.

## Using Sick Leave

Sick leave covers these circumstances,

- Illness
- Injury
- Serious illness in the immediate family
- Illness or disability resulting from pregnancy or childbirth
- Exposure to contagious disease

The City monitors employee sick leave per the City's Attendance Policy and takes action, as outlined in the Policy, to address sick leave issues.

Employees who are unable to attend work because of illness must notify their supervisor no later than one hour after the start of the work shift.  Similarly, if an employee becomes ill during the work day, he or she must give notice to the supervisor prior to leaving.

## Medical Appointments

When employees need to schedule a medical appointment during work hours, they should do so with minimal disruption to the work day.  Employees should follow the department process for scheduling an absence.   Some departments provide forms for this purpose; in other departments employees use the Liquid Office function available on the HUB. Employees must ensure appointments are approved in advance.

# Medical Leaves

In addition to the allotment of sick leave, employees may be eligible for these medical leaves, depending on the length of service and the specific reason for the leave. Medical leaves provided by the City include these:

- Family Medical Leave (FMLA leave)
- Pregnancy and Maternity Leave
- Reasonable Accommodation for a Disability
- Unpaid Medical Leave

Information about medical leaves is available on the HUB and at www.cityofboston.gov/ohr/benefits/absence.asp

Employees should contact Human Resources with questions relative to eligibility for leaves of absence and for assistance in completing the required forms. An employee should notify his/her supervisor as far in advance as possible when requesting any type of leave of absence.

The City provides employees with extended time off pursuant to the requirements of the federal Family & Medical Leave Act. In accordance with the Family and Medical Leave Act, the City will provide eligible employees with a family or medical leave up to twelve weeks.

The employee must have worked for the City for a specific period of time and furnish medical documentation indicating a serious medical condition for the employee or a member of the employee's immediate family as defined under provisions of the FMLA.

For more information on the Family & Medical Act, and other paid and unpaid medical leaves, employees should consult the City's Medical Leave Policy and the Office of Human Resources. A detailed description can also be found on the HUB under the Document Library tab.

## Additional Leaves

The City also grants leaves of absence to employees for the purpose of Bereavement, Jury Duty and Education. The conditions and lengths of these leaves vary according to the applicable collective bargaining agreement. Detailed information on these leaves can be found in the collective bargaining agreements, www.cityofboston.gov/labor/agreements.asp.

Personal Leave
Subject to the operating needs of the department, and with the approval of the Appointing Authority, an employee shall be granted an unpaid personal leave of absence for up to (1) year. Where possible, requests for personal leave should be initiated at least (3) weeks before the date of departure. An employee returning from a personal leave of absence will be placed in his/her same position or a similar position of equal classification.

Unionized employees should consult their respective collective bargaining agreements in order to determine if they are eligible for personal leave.

Boston Public Schools holds school preview time each year from mid-November to the first week in February. Four hours of work time may be taken for the purpose of previewing Boston public schools for the first time, or for students who wish to move to a new BPS school (transition grades only: kindergarten, first, sixth or ninth grades).

Under a state law called the Small Necessities Act, up to 24 hours of leave may be taken to participate in certain activities (parent teacher meetings, doctor or dental appointments for one's children or an elderly parent are but a few examples) under special circumstances. Information regarding this leave can be found in the Document Library on The Hub.

Revised 2015

# Important City Work Rules and Guidelines

These are some of the important rules and guidelines that City of Boston employees need to know.

## Hours of Work

Hours of work are determined by the needs of the City and the convenience of the public. For most positions, the work day is seven hours of work and a one-hour lunch break, which is not paid. Employees also receive two fifteen minute breaks per day. Lunch schedules and breaks are determined by the supervisor.

## Alternative Work Schedule

Under certain circumstances, employees may apply to the department for work hours that are different from the department's standard work hours. Employees may check the appropriate collective bargaining unit to ascertain if they are eligible for an alternative work schedule. The availability of an alternative work schedule is dependent upon the operational needs of the department.

## Attendance Policy

All employees are expected to be present and ready to work at the start of their work shift unless excused from work consistent with City policy or the applicable collective bargaining agreement. At the start of each work shift, each employee must document the actual time he/she started work on the time sheet or other time recording system used by the department. All employees must complete the time sheet fully and accurately and are strictly prohibited from falsifying any information on any time sheet.

The City of Boston Attendance Policy deals with

- Absenteeism
- Patterns in Absences
- Tardiness

Absences of employees are monitored on a monthly basis by the Office of Human Resources. Employees who exhibit excess instances of absences from work, defined by the Attendance Policy as 10 or more in any given 12 month period, will be required to submit medical documentation for future absences. Employees who demonstrate excessive and absenteeism, patterned absences and/or excessive tardiness may be subject to disciplinary action.

Please consult the City of Boston Attendance Policy for a comprehensive explanation of this policy and all its provisions.

## No Smoking Policy

The City is a smoke-free workplace. There are designated smoking areas outside the building.

## Picture I.D. Cards

All employees are issued picture identification cards.  They are available through the Office of Property Management, located in Room 801.  Security measures also require the general public and employees to pass through a metal detector.

## Dress Code

The City of Boston serves a very diverse population:  people of all cultural and educational backgrounds, all ages and all walks of life.  The City requires that employees have a neat and business-like appearance.
Office employees should not wear jeans, t-shirts, tank tops, sweatshirts or sweat pants.

## E-Mail and Internet Use

The City makes email and the internet available to employees for City of Boston business purposes.  Email or internet abuse is taken very seriously.
There is no such thing as privacy in email and internet use.  All email messages and internet sites, even ones that are deleted, are stored on a back-up tape.
The City monitors the sites visited by employees and keeps an electronic record of this information.
With respect to both email and internet sites, sexually explicit or otherwise potentially offensive materials will subject the employee to discipline, up to and including termination.

## Cell Phones and Personal Calls

City of Boston telephones are to be used for City of Boston business only.  Personal calls should be limited to breaks and lunch time except in the case of an emergency.  Cell phones should be used on breaks and during lunch time unless it is an emergency.

## Use of City Equipment

All City office equipment and supplies, including but not limited to stationery, copy machines and computers, are to be used for business reasons only.

## Use of City Vehicles

Under certain circumstances, the City provides employees, for work-related reasons, use of City vehicles.  Employees are required to sign a Vehicle Liability Form and provide a copy of a valid Massachusetts driver's license. As required by state law, all employees driving or riding in City vehicles must wear a seat belt.

## Prohibited Behaviors

Consuming alcoholic beverages or drugs during work hours is strictly prohibited.   It is forbidden to arrive at work under the influence of either drugs or alcohol.
Carrying guns, knives or other weapons in the workplace is strictly forbidden.
The City of Boston has zero tolerance for violence in the workplace, whether physical or verbal assaults or threats.
Violations of the above work rules can subject the employee to disciplinary action including termination.  Engaging in any of the above activities could result in loss of employment for the employee.

## Off Duty Conduct

All city employees are expected to act professionally at all times.  As such, inappropriate off-duty conduct may result in disciplinary action.

## Adverse Weather Policy

Each department head has the authority to designate essential employees who are critical to the operation of the department in case of adverse weather conditions.  Essential employees are expected to report for work or remain at work for their scheduled work shift in all situations, unless otherwise directed by their department head.  All employees are required to report to work in all situations unless they have been designated as non-essential by their department head and the Mayor's Office has announced, prior to the beginning of a workday, that non-essential employees are not to report.

## Customer Service Policy

The mission of the City of Boston is to enhance quality of life by providing consistently excellent services to all our residents, employees, vendors and visitors. Each and every one of our customers has the right to expect courteous treatment and competent assistance.  We respect the diverse backgrounds and identities of all our customers regardless of age, ancestry/ethnicity, language, race, color, disability, marital status, national origin, presence of children, religion, gender, sexual orientation and gender identity.

Employees will be held accountable for providing excellent customer service and evaluated on their performance in this area as part of their annual review.

## Sign Off on Work Rules

All employees are required to sign off on departmental work rules and regulations that address standards of conduct, behavior and performance.

# Important Workplace Policies

## Harassment Free Workplace Guidelines

The City of Boston wants all employees to work in an environment where they feel respected and free of harassment of any kind.  The City will take prompt and serious action to address conduct which is discriminatory or offensive on the basis of race, gender, religion, age or sexual orientation.

The following behaviors are examples of those considered inappropriate in the workplace. This list is not comprehensive.

- Unwelcome physical contact.
- Off color sexual, racist or ethnic jokes.
- Pictures, cartoons or e-mails with offensive content.

A description of these policies is in the booklet titled "The Respectful Workplace" on the HUB, under Documents Library.

## Questions and Concerns about Workplace Harassment

For a question or concern about harassment in the workplace, the employee has the right to choose to bring the matter to

- The supervisor
- Another manager
- The department head or cabinet chief
- The City's Assistant Director of Human Resources

If the employee does not wish to speak with the supervisor for any reason, he or she may speak with any manager in his/her department, including the head of the department. Employees can—and should—discuss any concern about harassment with the City's Assistant Director of Human Resources.  The employee can visit the office in room 612 City Hall or call at (617) 635-2788

The employee can, in place of the above options, or in addition to those options, contact

- The Massachusetts Commission Against Discrimination (MCAD)
- The Equal Opportunity Commission

## Diversity Values

All levels of City government must be responsive to the diverse cultural and linguistic communities of Boston. The City will make every effort to create an environment that welcomes everyone and treats everyone with fairness and dignity.  The City also offers interpreter services.

## Ethical Conduct and Conflict of Interest Policy

The City has high standards of ethics and conduct for its employees.  Employees are expected to carry out their obligations fairly and honestly.  City employees must never accept money or other forms of compensation given with the intent to influence your official actions or duties.

In addition, employees cannot have other employment that is incompatible with their City position.

The State Ethics Law requires all City employees to take the State Ethics Commission Online Training. For questions about this or any other ethical question on the job, contact the Law Department in Room 603 or at (617) 635-4034.

## The Americans with Disabilities Act

If an employee has a qualified disability, he or she is protected against discrimination at work and may be entitled to a reasonable accommodation to assist them perform his/her work.  Questions can be directed to the Commission for Persons with Disabilities at 635-3682.

## HIV/AIDS Policy

The City has a policy prohibiting discrimination against any person because they have HIV or AIDS or are perceived to have HIV or AIDS.  The City will make every effort to provide a reasonable workplace accommodation for a person with HIV or AIDS.  In addition, an employee is not required to reveal the nature of his/her illness or health condition but shall only be required to explain the necessity of absences from work.

## Zero Tolerance for Violence

The City of Boston has zero tolerance for violence of any kind.  Violence and/or threats of violence are a very serious offense and may result in severe disciplinary penalties, up to and including termination.

                                                 Revised 2015

# Professional Development and Continuing Education

## Tuition Reimbursement
Tuition reimbursement is available to employees in three of the City's unions:
- AFSCME Council 93
- SEIU Local 888
- SENA Citywide.

Employees can access these opportunities via that HUB Documents Library link.

## Scholarship Opportunities
The City has a scholarship program for those interested in pursuing master's degrees or graduate level certificate programs.  Two universities participate:
- Boston University
- Northeastern University

To qualify for a scholarship, a person must be a City employee with at least one year of service.  Employees can get more information about the scholarship programs on the HUB in the Document Library.

## Training Workshops and Courses
The city offers training and development opportunities to help enhance performance and career growth.  Employees may consult the HUB to find training on software programs such as
- Microsoft Word
- Excel
- PowerPoint

Employees can register on-line for these workshops through the HUB.

There are also training workshops on human resource development topics such as the Management Certification Program, supervisory and management development training, professional development and customer service.  Employees may consult the HUB My Career link to see when these are offered.

The personnel officer can also provide information about what training opportunities are available.

## Performance Review System
The City of Boston Performance Review System (PRS) has these aims:
- to provide an objective, consistent, and fair system for measuring employee performance
- to inform employees of the quality of their work, to identify those areas needing improvement, to set specific objectives for employees, and to provide employees an opportunity to discuss their career goals and the support they need to meet those goals

- to assist department heads and managers in evaluating their workforce, identifying employee potential, and establishing priorities for training and education

Performance evaluations are undertaken annually at the end of each calendar year.  The forms for evaluating performance can be found on the HUB, under Document Library tab.

## Office of Labor Relations Policies

### Grievance Process

Issues that have not been resolved through informal channels may be taken through a formal grievance process.  Employees covered under collective bargaining agreements should reference those agreements for specific grievance procedures.

Employees not covered by collective bargaining agreements should try to resolve issues through discussions with their immediate supervisor.

### Disciplinary Process

The City of Boston disciplinary system is founded on the premise that the actions taken are to be corrective rather than punitive in nature, are progressively more severe, and fit the nature of the problem. The City reserves the right to discipline or discharge employees by utilizing the progressive discipline process. The City intends disciplinary action to be based upon the employee's failure to fulfill his/her responsibilities as an employee.

Any questions or concerns regarding the disciplinary process can be directed to

- The department Personnel Officer
- The Office of Human Resources

### A. Discipline
a. Overview

It is the responsibility of all City of Boston employees to observe the policies, rules and regulations of the City. Violations of these standards, as well as non-performance of duties will lead to disciplinary action up to and including termination.

b. Disciplinary Process

Disciplinary action can occur at any time during the employment process in response to inappropriate off-duty or on-duty employee behavior, excessive absenteeism, violation of work rules and regulations, and/or poor job performance. In general, discipline will be administered in accordance with the principles of progressive discipline. Progressive discipline provides for increasingly serious disciplinary measures. However, the severity of any disciplinary action is dependent upon the nature of the offense. In some situations, employee behavior is so serious that immediate termination is warranted. If the City's investigation of the situation reveals that the employee committed what it determines to be a serious offense, then termination without progressive discipline would be proper.

Revised 2015

It should be clear that the City does not intend to guarantee at-will employees the right to progressive discipline. This policy is only intended to provide general guidance to personnel who supervise at-will employees and desire to follow progressive discipline principles. At-will employees may be disciplined or terminated at any time, for any reason, with or without cause.

The progressive disciplinary process may include:

* Counseling Sessions

* Written Warnings

* Suspensions without pay

* Termination


Employees should be aware that disciplinary letters, starting with written warnings, are placed in employee personnel files, and become a part of their employment history.

## List of Contacts

| Issue | Contact | Phone |
|---|---|---|
| | | |
| | | |
| Americans with Disabilities | Commissioner<br>Commission for Persons with Disabilities | 635-3682 |
| Attendance Policy | Senior HR Generalist<br>Office of Human Resources | 635-3374 |
| Classification and Compensation | Director of Compensation and Classification<br>Office of Human Resources | 635-3014 |
| Collective Bargaining Agreements | Labor Counsel<br>Office of Labor Relations | 635-4525 |
| Compensation | Director of Compensation and Classification<br>Office of Human Resources | 635-2787 |
| Conflict of Interest | Compliance Officer<br>Office of Human Resources | 635-3379 |
| Credit Union | City of Boston Credit Union<br>www.cityofbostoncu.com. | 635-4545 |
| Deferred Compensation | Massachusetts Smart Plan<br>www.mass-smart.com/ | (877) 457-1900 |
| Direct Deposit | Treasury Team<br>Treasury Department | 635-4151 |
| Disciplinary Issues | Labor Counsel<br>Office of Labor Relations | 635-4525 |
| Diversity | Director of Operations | 635-2788 |
| Drug Free Workplace | Compliance Officer<br>Office of Human Resources | 635-3379 |
| Educational Assistance | Training Coordinator<br>Office of Human Resources | 635-2221 |
| Email and Internet Policy | Chief Information Officer<br>Department of Innovation and Technology | 635-3358 |
| Employee Assistance Program | Director<br>Employee Assistance Program | 635-2200 |
| Equal Opportunity Policy | Director of Operations | 635-2788 |
| Ethics Policy | Compliance Officer<br>Office of Human Resources | 635-3379 |
| Family Medical Leave Act | Senior HR Generalist<br>Office of Human Resources | 635-3374 |
| Flexible Spending | Health Benefits Team<br>Office of Human Resources | 635-4570 |
| Financial Disclosure | Law Department | 635-4099 |
| | | |
| Issue | Contact | Phone |
| | | |
| Harassment Policy | Director of Operations<br>Office of Human Resources | 635-2788 |

| Health Benefits | Health Benefits Team<br>Office of Human Resources | 635-4570 |
|---|---|---|
| Help Desk (IT help) | Help Desk<br>Department of Innovation and Technology | 635-SERV |
| Holidays | Senior Administrative Assistant<br>Office of Human Resources | 635-3013 |
| Hub Help (Password assistance, etc.) | Hub Help Team<br>HubHelp@boston.gov | 635-1HUB<br>(1482) |
| Job Opportunities | Career Center<br>www.cityofboston.gov/ohr/careercenter | 635-3370 |
| Labor Relations | Labor Counsel<br>Office of Labor Relations | 635-4525 |
| Leaves of Absence | Senior HR Generalist<br>Office of Human Resources | 635-3374 |
| Life Insurance | Health Benefits Team<br>Office of Human Resources | 635-4570 |
| MBTA Pass | Treasury Team<br>Treasury Department | 635-4151 |
| Performance Evaluation | Training Coordinator<br>Office of Human Resources | 635-2221 |
| Posting Positions | Director of Compensation and Classification<br>Office of Human Resources | 635-3014 |
| Residency Policy | Compliance Officer<br>Office of Human Resources | 635-3379 |
| Retirement | Retirement Board Team<br>Boston Retirement Board | 635-4305 |
| Security | Security Team<br>City Hall Security | 635-4444 |
| Sick Leave | Sr HR Generalist<br>Office of Human Resources | 635-3374 |
| Sick Leave Redemption | Senior Administrative Assistant<br>Office of Human Resources | 635-3013 |
| Sick Leave Pool | Senior Administrative Assistant<br>Office of Human Resources | 635-3013 |
| Scholarships (Graduate Programs at BU and Northeastern) | Training Coordinator<br>Office of Human Resources | 635-2221 |
| Sexual Harassment | Director of Operations | 635-2788 |
| Tuition Reimbursement | Training Coordinator<br>Office of Human Resources | 635-2221 |
| Vacation Leave | Senior Administrative Assistant<br>Office of Human Resources | 635-3013 |
| Unemployment Compensation | Unemployment Claims Investigator<br>Office of Human Resources | 635-4240 |
| Violence Free Workplace | Director of Operations | 635-2788 |