# COMMONWEALTH OF MASSACHUSETTS

CIVIL ACTION NO. 1-20-cv-12082-DC

```
_____
                                        )
FELIX G. ARROYO,                        )
        Plaintiff,                      )
                                        )
        v.                              )
                                        )
CITY OF BOSTON AND                      )
MARTIN J. WALSH                         )
Mayor of Boston,                        )
        Defendants.                     )
_____)
```

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Felix G. Arroyo ("Arroyo"), by and through counsel, hereby bring this First Complaint and Jury Demand against the Defendants, City of Boston ("City"), and Martin J. Walsh ("Mayor Walsh"), (collectively referred to as the "Defendants"), as follows:

## PARTIES

1.      Plaintiff Felix G. Arroyo is an individual residing in the City of Boston, Massachusetts.

2.      Defendant City of Boston is a municipality in Suffolk County, Massachusetts, and a public employer under G.L. c. 150E § 1, *et seq.*  Its principal office is located at 1 City Hall Plaza, Boston, Massachusetts.

3.      Defendant Martin J. Walsh is, and was at all times relevant hereto, the Mayor of the City of Boston and in that capacity currently acts as the appointing authority for the City of Boston as that term is defined in M.G.L. c. 31.  Mayor Walsh is sued in his individual and official capacity as Mayor.

1

## JURISDICTION AND VENUE

4.      On September 19, 2017, Arroyo filed a Position Statement with the Massachusetts Commission Against Discrimination ("MCAD") in response to the Complaint filed with the MCAD by Hilani Morales ("Morales"), where Arroyo alleged that he was being treated unfairly and that he was being retaliated against.  His claim was within the scope of the MCAD's investigation.

5.      The Plaintiff timely presented his claim in writing to Defendants through a Letter of Presentment, dated August 15, 2019, and properly served to Mayor Walsh, the executive officer of the City of Boston.

## STATEMENT OF FACTS

6.      Arroyo had built a successful career in public service.  Prior to becoming the City's Chief of Health and Human Services, he dedicated over a decade of his life to public service and community organizing.  He worked to help pass the Affordable Care Act as the New England Field Director for Health Care for America Now and as an advocate for workers' rights as the Political Director for SEIU Local 615.  He was also elected for two terms as a Boston City Councilor.

7.      In an article published on June 22, 2010, the Boston Globe described Arroyo as receiving "a political education that began in grade school when his father worked at City Hall." The article further describes his early accomplishments as a first-term City Councilor.  "Those early civics lessons have given Arroyo the acumen to quickly establish himself as a significant presence. Not only was he integral to the resolution of the firefighters' contract dispute, he has been a vocal critic of a city plan to close libraries, he has promoted jobs and opportunity for

youth, and he even managed to make himself a lightning rod in the national debate over illegal immigration."

8.      In 2013, both Mayor Walsh and Arroyo launched campaigns for Mayor of Boston.  Arroyo was unsuccessful in his bid for Mayor and Mayor Walsh was ultimately elected Mayor in November 2013.

9.      Although Arroyo had been a political rival of Mayor Walsh, he agreed to appoint Arroyo as the cabinet-level position of Chief of Health and Human Services for the City of Boston.  Walsh stated that he was offering the position as Chief of Health and Human Services to Arroyo for as long as he served as Mayor.  Arroyo immediately accepted the offer.  Arroyo worked in that position from January 6, 2014 until he was wrongfully terminated on August 24, 2017.

10.     Prior to Mayor Walsh's offer of an appointment as Chief of Health and Human Services for the City of Boston to Arroyo, the two discussed Arroyo's background, qualification and ambitions.  Arroyo related frankly, that although he had been defeated by Mayor Walsh in 2013 election, he had the goal of becoming the Mayor of Boston and he intended to run for the position at some point in the future.

11.     Arroyo was Mayor Walsh's first appointment to his Cabinet.  Mayor Walsh publicly announced Arroyo's appointment the day before he was sworn into office.  In an article published by the Boston Globe on January 6, 2014, Mayor Walsh is quoted as saying: "Felix brings a wealth of knowledge and City of Boston experience to my administration.  Felix knows how to bring people together and work collaboratively.  He values and understands the importance of directly addressing the needs of Boston's most vulnerable residents, and he will have a huge impact on our city in this role."

12.     Walsh was sworn-in as the Mayor of Boston in January 6, 2014 to serve a four-year term of office.  Arroyo officially began serving in the position as the Chief of Health and Human Services on the same day.

13.     As Chief of Health and Human Services, Arroyo created the "Engage, Advocate, and Serve" cabinet-wide tagline and initiatives to improve access to existing City services, develop new policies, and to serve Boston's most vulnerable residents.  He led, created and implemented overall organizational strategic planning.  He brought together department heads and staff on a monthly basis to have Health and Human Services Leadership Team ("HHS") meetings that included guest speakers and created professional development opportunities. Arroyo collaborated with public and private partners to advance initiatives, including those that promoted racial equity.  Arroyo developed and implemented a hiring toolkit to promote and increase diversity.

14.     Arroyo was a dutiful employee who earned a positive reputation.  On August 6, 2017, the Boston Globe published an article that reports: "Several City Hall staffers say he is a consummate professional who respects his staff and cares deeply about the city's most vulnerable residents and the city workers who serve them."

15.     According to the City's own response filed with the MCAD filed on October 4, 2017, it learned about allegations made against Arroyo on or about July 24 and 25, 2017, which was the first time it had learned of any allegation of sexual harassment involving Arroyo.

16.     Defendant, at all relevant times to these causes of action, maintained a policy manual, "An Employee Guide to Benefits, Rights and Responsibilities," hereinafter referred to as the City of Boston Employee Manual, which includes a policy on the disciplinary process that

governs the discipline of employees in response to violations of work rules and regulations or inappropriate off-duty or on-duty employee behavior.  Exh. 1.

17.     On July 27, 2017, the City placed Arroyo on administrative leave pending an investigation into the allegations.  The Mayor's Chief of Staff, Dan Koh and Corporation Counsel, Eugene O'Flaherty informed Arroyo that he was placed on administrative leave orally and in writing.

18.     On July 27, 2017, Eugene O'Flaherty told Arroyo that the allegations were serious and that Arroyo needed to resign immediately.  He told Arroyo that he should not be thinking about keeping his job, but think about keeping himself out of jail.

19.     Arroyo denied all allegations of misconduct, and to date, has denied all allegations of misconduct brought forth in multiple, contradictory statements by Morales.

20.     In the July 27, 2017 letter addressed to Arroyo and signed by Corporation Counsel, the City stated that Arroyo had been placed on paid administrative leave "pending the City of Boston's investigation of a serious complaint including allegations of harassment and retaliation."  The City did not inform Arroyo that the allegations being investigated involved allegations of sexual harassment nor did the City provide notice of any of the specific allegations made against him.  The City denied Arroyo his right to know the allegations or of any evidence submitted or alleged and refused to even inform him of the source of the complaint.

21.     The July 27, 2017 letter also stated that during administrative leave, he was "prohibited from having contact with any City employees."  This prohibition interfered with his right to present evidence.

22.     The July 27, 2017 letter further instructed Arroyo to "not take any action that could be perceived as retaliatory against anyone who may have information relevant to the City

of Boston's investigation."  The City explicitly states, "Engaging in such misconduct is prohibited and may be grounds for immediate termination of your employment."

23.     The City also demanded that Arroyo refrain from publicly commenting on the case.

24.     On or about July 27, 2017 Arroyo and Morales were told that the investigation would be handled by an independent investigator and not by the City of Boston Human Resources Department.  In spite of the fact that there was now an independent investigator involved, Jennifer Wexler, a City of Boston Human Resources employee remained in communication with Morales, encouraged Morales to speak to City employees to recruit potential witnesses.  Wexler also asked Morales to send any potential witnesses to her so that she can speak to them prior to providing their names to the independent investigator of their existence.  In this way, the City "screened" the information provided to the independent investigator.

25.     At the time of the investigation Arroyo supervised seven department heads.  Six of the seven were women.  The investigator did not interview any of the seven department heads.

26.     According to the City's response to the MCAD, "Upon receipt of the complaint, a decision was made to use outside counsel for the investigation into Complainants allegations against Arroyo."  According to the City, "The investigation began immediately."

27.     The City's investigation was a sham from the beginning as the City of Boston made the determination to terminate Arroyo prior to interviewing key witnesses to verify the allegations of Morales.

28.     The City hired Attorney Kay Hodge to conduct the investigation.  Arroyo had no input in the selection of the investigator and was denied the opportunity to have an unbiased investigation.  Attorney Hodge has represented the City against workers in numerous disputes before the Massachusetts Civil Service Commission and in the federal and state courts.

29.     On August 1, 2017, the Boston Globe published a story about Arroyo being placed on administrative leave based on a leak from City Hall.  That alone created irreparable harm to his reputation and professional future.

30.     Arroyo, through counsel, repeatedly requested the details of the specific allegations and the source of the complaint in writing, but the City refused to provide it.  Arroyo's lack of notice about the complaint and its source leaving him the inability to defend himself and his public reputation.

31.     Rather than receiving information from the City, the press confirmed to Arroyo that the source of the complaint was a City employee, Hilani Morales.  On or around August 7, 2017, Arroyo received a press inquiry in which he learned that the press was aware of the specific nature and source of the complaint against Arroyo and was considering a story citing a City employee as a source.  Arroyo met all press inquiries with no comment because of the City's demand to refrain from public comment.  Arroyo was not allowed to defend himself, which further damaged his public reputation.

32.     On August 8, 2017, Attorney Hodge confirmed that the investigation was confidential, and the City would not be speaking with the press despite the fact that a City employee had already leaked details of the investigation that the City had withheld from Arroyo, to the press.

7

33.     Attorney Hodge requested to interview Arroyo.  An interview was arranged to take place on August 16, 2017.  Arroyo was never provided with a copy of the allegations against him and therefore denied the opportunity to respond to each allegation specifically or thoroughly prepare a defense.

34.     On August 14, 2017, Arroyo, through counsel, requested a copy of the City of Boston Employee Manual, the specific allegations against him and the name of any complainant, evaluations completed by HHS Leadership Team members of him as Chief of Health and Human Services, access to his work emails, and an affirmative answer in writing whether the City had expressed a desire or preference to fire him prior to the completion of the independent investigation.  Despite the City's refusal to fulfill his requests, Arroyo remained fully cooperative.

35.     On or around August 14, 2017, Arroyo also provided the investigator with the names and titles of 25 relevant witnesses, most of whom were women and members of the Health and Human Services Leadership Team who met with Arroyo on a monthly basis.

36.     On or around August 16, 2017, Arroyo through counsel, provided Attorney Hodge with relevant evidence, including evidence of text messages that his accuser had sent to another City employee making contradictory and inconsistent allegations against Arroyo during the investigation.

37.     Arroyo provided exculpatory evidence to Attorney Hodge that wholly disproves the differing version of allegations.

38.     The evidence provided also demonstrated that Morales was in contact with other City employees and was making efforts to manipulate the investigation including her desire to garner press.  The text messages included one that Morales sent on July 28, 2017, in which

Morales stated that the City's Human Resources Department told her that they wanted Arroyo to resign, and Morales stated: "I want the media to find out."  Again, on August 1, 2017, Morales stated: "They want to fire Felix."

39.     According to the City, Morales had participated in an initial interview, but declined Attorney Hodge's request for a follow-up interview.

40.     On August 16, 2017, Arroyo willingly participated in the interview with the investigator.  The interview took place in the afternoon.  Arroyo denied all allegations of misconduct.

41.     The next morning, at 7:22 AM on August 17, 2017, Morales sent a message to the same co-worker involved in the text exchange provided to Attorney Hodge, saying, "You broke my heart.  Goodbye."  Later, that same day, on August 17, 2017, Morales filed a MCAD Complaint, and then shortly after, shared the Complaint with the Boston Globe, as confirmed by the newspaper.  The Boston Globe also credits her with providing them with emails she received from Chief Dan Koh.

42.     The evidence demonstrably shows that the City provided Morales with access to opposing evidence and work emails, contact with City employees, and notice of the proposed termination of Arroyo, all of which the City refused to provide to Arroyo.  It also demonstrates clear bias against Arroyo during the investigation.

43.     The City's posture during the investigation of Arroyo, a former and likely future political rival, was wholly different from other similar investigations that they had undertaken in the past.  Most tellingly, in 2014, Morales had made sexual harassment allegations against another City of Boston Department Head, Leon Graves ("Graves").  Graves was a close ally of

Mayor Walsh.  Despite the allegations, Graves was not terminated and has been promoted since Morales made allegations against him.

44.     The pattern of retaliation by his accuser against Arroyo went unchecked by the City.  The damage to Arroyo was exacerbated by the dissemination of information that was presented as a confidential investigation.  This allowed further damage to Arroyo's reputation and political standing in the community.

45.     On August 21, 2017, Arroyo through counsel provided Attorney Hodge with additional evidence that was both material and probative to the investigation.

46.     On or around August 21, 2017, Mayor Walsh told Arroyo that he did not believe Morales's allegations and would not fire Arroyo, but that he should consider resigning in order to protect his career.

47.     On August 22, 2017, the Boston Globe published a story detailing the allegations by Morales that were contained in her MCAD complaint.

48.     On or around August 22, 2017, after the August 22, 2017 article in the Boston Globe was published online, the City's Corporate Counsel, Eugene O'Flaherty called Arroyo's attorney and said that Arroyo could resign or be fired.  He made these comments despite the investigation not being complete or thorough because Mayor Walsh wanted Arroyo out of City government for political reasons.

49.     The City failed to protect the reputation of Arroyo.  In the August 23, 2017 article in the Boston Globe, Mayor Walsh is quoted as saying: "Nobody should have that feeling, [coming into] a hostile work environment. No one should ever have that," when asked generally about sexual harassment. "That's something that bothers me, particularly a woman, and I don't want that happening in my administration."  Further, the City's communications chief, Laura

Oggeri, is quoted as saying: "These allegations are intolerable and disturbing.  We take the safety and well-being of our employees very seriously and we are working to get to the bottom of this as soon as possible."

50.     Mayor Walsh and the City made these statements purposively before undertaking any real investigation and fully believing the allegations had no merit.  Further, by making about a hostile work environment and safety, it created the false impression that Arroyo had created a hostile work environment and was dangerous.

51.     In the August 23, 2017, article in the Boston Globe, Lieutenant Detective Michael McCarthy of the Boston Police Department and an agent of the City is quoted as saying that he: "is attempting to contact the victim to see if she wanted to file a criminal complaint."  By making this statement and referring to Morales as "the victim," the City prejudged Arroyo and created among the public the impression that Arroyo was guilty of criminal conduct.  A criminal complaint was never filed against Arroyo.

52.     The treatment of Arroyo was wholly different because of his status of being a potential future rival of Mayor Walsh.  This is demonstrated by other prior investigations.  For example, in 2014, Morales had made sexual harassment allegations against her former supervisor, Leon Graves ("Graves").  Graves also worked for the City of Boston, but was a close ally of Mayor Walsh.  Despite the allegations, Graves was not terminated and has been promoted since Morales made allegations against him.

53.     On August 23, 2017, Mayor Walsh requested again that Arroyo to resign or be fired, despite not believing the allegations or having completed a comprehensive investigation.

54.     On August 23, 2017, Attorney Hodge requested that Arroyo meet with her the to conduct a follow-up interview.  The nature and purpose of the interview had been described as to

ask a few additional questions in order to conclude their investigation.  Arroyo agreed to participate in the follow-up interview.  The meeting was arranged for Friday, August 25, 2017.

55.     The City abruptly terminated Arroyo on Thursday, August 24, 2017 before he had the opportunity to participate in the investigator's follow-up interview and before he had an opportunity to fully defend himself.

56.     The investigation was used as a way for Mayor Walsh and the City to terminate Arroyo's employment, despite the fact that they believed the allegations to be untruthful.  In fact, the City purposely failed to interview key witnesses, prior to termination Arroyo, as they knew these witnesses would confirm the falsity of the allegations.

57.     For example, the HHS Director of Operations was a witness to a meeting which Morales claimed Arroyo attacked her.  Bernard Killarney asked the HHS Director of Operations to interview regarding Morales's allegations and he agreed.  When it was determined that the HHS Director of Operations would have information supporting Morales's allegations as being patently false, the HHS Director of Operations was told that he would not be interviewed.

58.     Likewise, the City, failed to interview Bernard Killarney.  According to Morales, she complained to him immediately after Arroyo choked her.  Again, when the City realized his testimony would not support Morales's story, they failed to have the investigator speak with him.

59.     Arroyo was never provided the opportunity to cross-examine adverse witnesses and was not even informed of what evidence was being used against him.  The City never provided Arroyo with names of the individuals that were interviewed during the process, and never provided him with transcripts of the interviews of witnesses conducted as a part of the investigation.

60.     Attorney Hodge neglected to interview favorable witnesses to Arroyo, including those who could provide highly relevant information.  Notably, one of the City employees that worked closely with Arroyo had affirmatively contacted the City to provide testimony as a direct witness to at least one of the alleged incidents, but he was never interviewed.  In a column published in the Boston Globe, Joan Vennochi described how through affidavits, city workers stated that they never witnessed any of the inappropriate behavior described in the MCAD complaint.  She notes how a City employee "who claimed to have a direct sight line into Arroyo's office [at the time that he was alleged to have grabbed his accuser by the neck], provides this account: 'The door remained open during their meeting, . . . I watched the entire conversation.  Felix's desk was between Felix and (the woman) the entire time.  He did not move from behind his desk and was never even within arm's length of her.  Felix never touched her.'" Attorney Hodge never interviewed this City employee despite his affirmative request to be interviewed and despite his material and probative testimony.  She failed to interview these people because the City only wanted to feign the appearance of an investigation in order to eliminate Arroyo from his position and damage his future political career.

61.     The City never provided Arroyo with written findings of fact from the investigation.  Arroyo had to request a copy of the report prepared by Attorney Hodge from the Office of Attorney General.

62.     In her findings, Attorney Hodge found both Arroyo and Morales credible, despite Morales giving different versions of events and providing no evidence in support of her statements.  Attorney Hodge never informed Arroyo of the allegations against him or allowed him to call City employees as witnesses.  She allowed hearsay evidence to be used.  In her conclusions, she found that the City could be found liable if the matter went to court.

63.     The written findings made by Attorney Hodge do not consider or make reference to exculpatory evidence provide by Arroyo.  Further, it fails to consider all of the evidence provided, including evidence of Morales' intent was to ensure that Arroyo was fired from his post as Chief of HHS, that his reputation be irreparably damaged, and that he be publicly humiliated.  It fails to even mention the multiple, inconsistent versions of the allegations provided by Morales during the course of the investigation.  It also fails to consider evidence of past allegations made by Morales against other individuals or disclosure of personal information to other members of the HHS team that challenges the credibility of her allegations, including evidence of openly sharing with her co-workers: information about her drug use; the difficulties she experienced in her marriage; her divorce proceedings; her complaints about her husband missing a testicle; alleged mistreatment from her husband, her mother-in-law and her father; and, inappropriate aspects of her sexual life with her HHS co-workers, including visits to strip clubs and favorite sex toys.

64.     On October 4, 2017, the City responded to Morales's MCAD complaint and stated that they had no evidence that Arroyo did what was alleged in the complaint.  Only months before, Mayor Walsh implied to the media that there was a "hostile environment."

65.     On or around November 21, 2017, Morales withdrew her MCAD complaint. In March of 2018, Morales filed a civil complaint against Arroyo and the City, where she alleged sexual harassment and retaliation.

66.     At the time of his termination, Arroyo was the only Latino on the Mayor's Cabinet.

67.     In other instances where allegations of misconduct have been made against non-Latino employees, the City protected the confidentiality of the investigation and ultimately did not terminate employment of those employees based on the existence of allegations.

68.     With the knowledge that the City had no evidence that Arroyo had committed any acts of sexual harassment, as was the truth based on the City's own statement to the MCAD, Mayor Walsh characterized Arroyo's termination as the "appropriate step following an investigation 'concerning' complaint of sexual harassment.

69.     In the August 25, 2017 article in the Boston Globe, Mayor Walsh, before making the announcement of Arroyo's dismissal is quoted as saying: "I don't think we have fundamental issues with people [being] afraid to come forward with any type of . . . sexual harassment [complaint]." Mayor Walsh made these statements in conjunction with the termination of Arroyo without giving Arroyo an adequate opportunity to demonstrate that he had not committed sexual harassment and to clear his name.

70.     On August 25, 2017, the Boston Globe reported the Mayor Walsh said Morales's transfer was "for the woman's safety." Mayor Walsh's statements to the press implied that Arroyo was a dangerous person despite the fact that he had exculpatory evidence proving the allegations were false and by the City's own admission, had no evidence of the allegations being true.

71.     The City did not convey to the Boston Globe what it stated in its Position Statement to the MCAD, that it had no evidence that Arroyo had done what was alleged by Morales. In spite of the City having no evidence that Arroyo did what Morales alleged, the Mayor made the following statement to media: "If your daughter worked under Felix Arroyo,

you would want me to fire him too." This furthered Mayor Walsh's aim to destroy Arroyo's political aspirations.

72.     Mayor Walsh and the City consistently told the press that Arroyo's termination was based on the results of the internal investigation. These statements are demonstrably false as the decision to terminate Arroyo had been made prior to the conclusion of the investigation and knowing there was clear evidence to the contrary of the allegations made. This evidence was ignored by the Mayor so that he could fire Arroyo and destroy his reputation and political career.

73.     In the August 27, 2017 article, the Boston Herald reported that Mayor Walsh made the call to fire Arroyo based on an internal probe.

74.     In the August 27, 2017 article, the Boston Globe reported that the City's communications chief said in an email statement that he was terminated from the City of Boston "after a comprehensive internal investigation." This statement was reported by multiple media outlets, including U.S. News and World Report, NBC Boston, CBS Boston, NECN, WCVB, WBUR, Boston Magazine, the Bay State Banner, and the Dorchester Reporter.

75.     In a September 25, 2017 article published in the Boston Globe, the City's communications chief is quoted as saying: "Arroyo, who was an employee at will, was terminated after a comprehensive investigation that concluded Aug. 23." Again, it was reported in the February 23, 2018 article in the Boston Globe that: "The city said it terminated Arroyo after it completed its own "comprehensive internal investigation" that started July 27 and concluded Aug. 23." This is false. August 23, 2017 is the day that Attorney Hodge requested a follow-up interview of Arroyo in order to conclude the investigation. Arroyo was terminated before the follow-up interview took place.

76.     By falsely claiming that Arroyo's termination was the result of a comprehensive investigation, Mayor Walsh's and the City's led to further harm to his reputation by creating the belief that the City had evidence of wrongdoing when, in fact, as the City later admitted in its MCAD response, it had no evidence that Arroyo had done what was alleged in the MCAD complaint.

77.     In the August 25, 2017,  article published by WBUR, Mayor Walsh is quoted as saying: "Any time that we have any type of allegations in the city of Boston where there's somebody that feels threatened or concerned, we're gonna do an investigation and we're gonna take the proper action and that's what we did in this case."  The clear implication is that Mayor Walsh and the City had evidence of wrongdoing, which is false.

78.     Mayor Walsh and the City made the statements alleged above with knowledge of, their falsity for the purpose of harming the pollical career of Arroyo.

79.     At all times relevant to the making of the statements alleged above, Laura Oggeri was an employee or agent of the City acting within the scope of her employment or agency.

80.     As reported in the Boston Globe in its August 25, 2017 article, "The termination derailed Arroyo's rapid rise in city politics."  Having received a political education since he was a child, Arroyo's entire career and expertise has been developed in public service.  The allegations and false statements made by the City have destroyed his reputation and thus his career, as was the intention of his accuser.

81.     Defendants' wrongful conduct likely will prevent Arroyo from returning to public service and destroying his dream of being elected Mayor for the City of Boston.

82.     The adverse publicity from Defendants' false statements and otherwise wrongful conduct has clearly had a severe impact on Arroyo's reputation and ability to pursue employment because, among other things, Defendants have publicly charged him with sexual harassment.

83.     Published statements demonstrate the harm caused by Mayor Walsh's and the City's statements and their withholding of the truth that the City had no evidence supporting Morales's allegations.

84.     In an article published in the Boston Herald on August 25, 2017, Boston City Councilor At-Large Annissa Essaibi George is quoted as saying on Herald Radio: "I am not privy to the findings of the investigation, but I trust that, if it lead to a termination, the findings must have been significant."

85.     In the August 25, 2017 article published in the Boston Herald, a political science professor is quoted as saying: "The only way I see this is a political loss is. . . if for some reason these allegations don't pan out, the rush to judgment would hurt [Walsh].  But I don't think he (Walsh) would do it lightly."

86.     In the October 11, 2017 article published in The Bay State Banner, State Representative Holmes is quoted as saying: "The fact that he was fired while facing harassment charges will damage his career.  Even if he's found to be innocent, his reputation is substantially damaged."

87.     After his termination, Arroyo volunteered to move boxes in the office of the Suffolk County Probate and Family Court Registry, where his father serves as the Register of Probate.  The Office of Human Resources of the Trial Court informed Register Arroyo that Arroyo was prohibited from volunteering in the office due to the sexual harassment allegations and resulting termination of Arroyo from the City of Boston.  The Office of Human Resources of

the Trial Court explicitly stated since Arroyo was terminated, the City must have concluded that the allegations against him were true.

88.     A Google Internet search of Arroyo now produces the Defendants' various defamatory statements, as a result of which those false statements are constantly and foreseeably republished on a regular basis to Arroyo's personal and professional detriment.  For example, a February 26, 2020 article in the Boston Globe reported: "Her allegations upended City Hall in the summer of 2017, and derailed Arroyo's rapid ascension through Boston politics from a city councilor to mayoral candidate and a member of Walsh's Cabinet."  The move, the city said, was made to "ensure Morales's safety" and to avoid any interactions between her and Arroyo.  "A spokeswoman for the mayor said his office had no comment."  Mayor Walsh and the City made no attempt to correct the record or disclose that the City has no evidence of Arroyo committing any of the wrongdoing that was alleged in the MCAD complaint.

89.     As a result of being terminated, Arroyo lost, in addition to his compensation, his health care insurance, dental care benefits, eye care benefits, and other benefits guaranteed to him by the terms and conditions of his employment.

90.     As a direct and proximate cause of the results of the Defendants' conduct, Arroyo has suffered physical, emotional, and economic injuries.

91.     Arroyo continues to suffer the harmful reverberations of Defendants' statements and other wrongful conduct.

92.     Arroyo has and will continue to suffer monetary damages as a result of the irreparable harm to his reputation.

93.     Defendants are responsible for the harm that Arroyo has suffered and continues to suffer, and they must compensate him for these losses.

94.     On or about August 15, 2019, Plaintiff presented his claim pursuant

to G. L. c. 258, § 4, by sending a letter by certified mail, return receipt requested, to Martin J.

Walsh, Mayor of the City of Boston including a description of the claim and demand for relief

(the "Presentment Letter").

95.     The City of Boston did not respond to the Presentment Letter and the parties did

not otherwise reach a final settlement of this claim.

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF CONTRACT
### VERSUS THE CITY OF BOSTON AND WALSH ACTING IN HIS OFFICIAL
### CAPACITY ONLY

96.     The Plaintiff repeats and re-alleges Paragraphs "1" through "95," inclusive, and

hereby incorporates the same by reference as if set forth fully herein.

97.     The City of Boston Employee Manual constitutes a contract that is a limited

property right.  The language contained in the City of Boston Court Employee Manual that

describes the Court's disciplinary action process was a promise to the Plaintiff regarding

any disciplinary action towards him.  This process was disseminated to the Plaintiff, who

accepted these terms, which modified his at-will employment status with Defendant.  As an

employee, Arroyo had every right to expect the disciplinary action process would be

implemented in the process. The failure of Defendants to implement the City of Boston Court

Employee Manual policies was a breach of contract and resulted in injury to Arroyo.

WHEREFORE, Arroyo demands Judgment against the Defendants, Mayor Walsh acting

in his official capacity and the City of Boston, jointly and severally, for breach of

contract:

A.  That the Plaintiff be awarded back pay;

20

B.  That the Plaintiff be awarded compensatory damages;

C.  That the Plaintiff be awarded mental and physical pain and suffering damages;

D.  That the Plaintiff be awarded punitive damages;

E.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

F.  And for such other relief as this Court may deem just and proper.

## COUNT II – VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983 VERSUS ALL DEFENDANTS

98.     The Plaintiff repeats and re-alleges Paragraphs "1" through "97," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

99.     The procedures used to terminate Arroyo breached the contract of employment that existed between Plaintiff and Defendant and violated his due process rights.  Defendants deprived Arroyo of his employment as the Chief of Health and Human Services, a constitutionally protected property and liberty interest, under color of law, without substantive and procedural due process of law, violating his rights under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

100.     Defendants both verbally and in writing informed Arroyo that there would be an independent investigation into the claims, confirming that Arroyo did indeed have a due process right and that the Defendants acknowledged that right.

101.     Defendants repeatedly told the media that the allegations against Arroyo would be comprehensively investigated by an independent investigator, once again acknowledging that Arroyo had a due process right.

102.     Defendants past practice was the acknowledge the due process rights of similarly employees such as Leon Graves, an at-will employee who was accused of sexual harassment by the same accuser, and continues to be employed by the City of Boston.

103.    Defendants denied Arroyo a meaningful and constitutionally sufficient hearing prior to terminating Arroyo's employment as the Chief of Health and Human Services thereby denying Plaintiff due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

104.    Mayor Walsh limited the investigation and the made statements to the press that were substantially different than he did in the past for similar sexual harassment allegations made against his political allies, such as Leon Graves.

105.    Walsh privately acknowledged to Arroyo that he believed the allegations to have no merit, but still publicly vilified Arroyo in the media insinuating that Arroyo had committed the sexual harassment as alleged by Morales. He ordered Arroyo's termination, having the City conduct only a limited investigation that purposely avoided individuals that disputed Morales's allegations.

106.    Mayor Walsh did this to destroy Arroyo's future political career.  Arroyo was a former and likely future political rival as Arroyo he had plainly indicated to Mayor Walsh his desire to run for mayor in the future.

107.    Other city employees, urged Arroyo to resign based on the allegations that they knew were likely false.  The Boston Corporation Counsel even suggested that the Plaintiff might be jailed due to the allegations and he should resign in order to devote his full attention to the allegations.

108.    The Plaintiff was terminated, not because the City discovered Morales's allegations to be truthful, but rather to destroy the political career of Arroyo.

109.    As a result of the unlawful conduct of Defendants, Arroyo suffered economic damages, including, but not limited to, lost wages, lost fringe benefits and lost earning potential.

In addition to suffering economic damages, Arroyo has suffered severe physical and mental pain and suffering and damage to his reputation as a result of the Defendants' unlawful and discriminatory conduct.

WHEREFORE, Arroyo demands Judgment against the Defendants, Mayor Walsh and the City of Boston, jointly and severally, for violations of Plaintiff Arroyo's civil rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution as follows:

    A.  That the Plaintiff be awarded back pay;

    B.  That the Plaintiff be awarded compensatory damages;

    C.  That the Plaintiff be awarded mental and physical pain and suffering damages;

    D.  That the Plaintiff be awarded punitive damages;

    E.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

    F.  And for such other relief as this Court may deem just and proper.

## <u>COUNT III – DEFAMATION</u><br><u>VERSUS MAYOR WALSH IN HIS INDIVIDUAL CAPACITY</u>

110.    The Plaintiff repeats and re-alleges Paragraphs "1" through "109," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

111.    As set forth in detail above, Defendant Mayor Walsh each published statement of and concerning Arroyo that he knew to be false, or in reckless disregard of their falsity in order to damage Arroyo's reputation. The statements were false, defamatory, and defamatory per se.

112.    Mayor Walsh made statements such as "[i]f your daughter worked under Felix Arroyo, you would want me to fire him too;" "[n]obody should have that feeling, [coming into] a hostile work environment. No one should ever have that"; and Morales was transferred for her "safety" and that he needed to "make sure all city employees feel safe at City Hall . . . ."

113.    Because Mayor Walsh's comments were interspersed with comments regarding the purported comprehensive investigation undertaken by the City and that he "was confident in the findings. . . ." Mayor Walsh's comments were reasonably understood as implying the existence of undisclosed defamatory facts about Arroyo.

114.    In doing so, Defendant Mayor Walsh held Arroyo up to public scorn and ridicule, and destroyed his good name and reputation. Despite being an individual who takes great pride in his professional achievements and being an advocate and leader in the fight for social justice and promoting racial equity, the public and his current and future employers have been left with the false understanding that Arroyo is dangerous, has been violent and sexually harassed a co-worker.

115.    The consequences to Arroyo have been devastating. For example, a Google Internet search of Arroyo now produces the Defendant's various libels and slanders, as a result of which the Defendant's defamatory statements are constantly and foreseeably republished on a regular basis, all to Arroyo's personal and professional detriment.

116.    The published statements of and concerning Arroyo were defamatory per se because they imputed dishonorable conduct and criminal conduct to Arroyo, and because they injured Arroyo in his trade or business.

117.    All of the statements described above were false, malicious, and were published with a knowing, intentional, subjective awareness of, or in reckless disregard of, their falsity.

118.    Mayor Walsh's statements were made in his individual capacity as they were not made to serve the City's interests, but rather to damage the reputation of a likely future political rival.

24

119.   As a result of Defendant's wrongful conduct, Arroyo's reputation has been gravely damaged.  His ability to obtain work in public service or politics has been obliterated. Arroyo has suffered significant damages, including damages to his personal and professional reputations and emotional distress and economic damages.

WHEREFORE, Arroyo demands Judgment against the Defendant Mayor Walsh individually for defamation as follows:

    A.  That the Plaintiff be awarded seeks compensatory damages;

    B.  That the Plaintiff be awarded mental and physical pain and suffering damages;

    C.  That the Plaintiff be awarded punitive damages;

    D.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

    E.  And for such other relief as this Court may deem just and proper.

## <u>COUNT IV – WRONGFUL TERMINATION<br>VERSUS ALL DEFENDANTS</u>

120.   The Plaintiff repeats and re-alleges Paragraphs "1" through "119," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

121.   The Defendants terminated the Plaintiff due to his refusal to resign and in order to harm his political reputation.

122.   The Plaintiff's discharge was in violation of public policy as it came about in retaliation for the Plaintiff's refusal to resign, his desire to have the City investigate the allegations, and to destroy the Plaintiff's political reputation.

123.   The Plaintiff has suffered career loss, a financial loss, emotional distress, plus attorney's fees, costs and interest.

WHEREFORE, Arroyo demands Judgment against the Defendants as follows:

    A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded emotional distress damages;

C.  That the Plaintiff be awarded punitive damages;

D.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

E.  And for such other relief as this Court may deem just and proper.

## COUNT V – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## VERSUS ALL DEFENDANTS

124.    The Plaintiff repeats and re-alleges Paragraphs "1" through "123," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

125.    As alleged above, Defendants Mayor Walsh and the City of Boston made defamatory statements about Arroyo with, at the very least, negligent disregard as to the falsity of those statements.

126.    As a direct and proximate result of Defendants' wrongful conduct, Arroyo has suffered severe emotional distress resulting in the physical manifestation of that emotional distress by objective symptomology and other damages.  These include, headaches, stomach aches and Arroyo now suffers from depression.  Arroyo treats for his depression with a psychiatrist and has been prescribed medication.

127.    A reasonable person would have suffered emotional distress under the circumstances to which Arroyo was exposed.

WHEREFORE, Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded emotional distress damages;

C.  That the Plaintiff be awarded punitive damages;

D.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

E.  And for such other relief as this Court may deem just and proper.

## COUNT VI – MASS CIVIL RIGHTS ACT, CH. 12, SEC. 11H AND 11I
## VERSUS ALL DEFENDANTS

128.    The Plaintiff repeats and re-alleges Paragraphs "1" through "127," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

129.    The named defendants, acting under color of law and otherwise, have attempted to interfere by threats, intimidation or coercion, with the exercise or enjoyment of Plaintiff's rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the Commonwealth.  These rights include the Plaintiff's right to be employed, the Plaintiff's right to not be forced to resign from his job, and the Plaintiff's right to defend himself against allegations brought by Morales.

130.    The Defendants interfered with the Plaintiff's rights via multiple actions, including but not limited to, threatening the Plaintiff stating his political career would be harmed unless he complied with their requests, telling the Plaintiff that he might go to jail due to the allegations and therefore he needed to resign, and not allowing the Plaintiff to fully participate in the investigation into Morales's allegations.

WHEREFORE, Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded emotional distress damages;

C.  That the Plaintiff be awarded punitive damages;

D.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

E.  And for such other relief as this Court may deem just and proper.

## COUNT VII – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
## VERSUS THE CITY OF BOSTON AND WALSH ACTING IN HIS OFFICIAL
## CAPACITY ONLY

131.    The Plaintiff repeats and re-alleges Paragraphs "1" through "130," inclusive, and hereby incorporates the same by reference as if set forth fully herein.

132.    The contract between Plaintiff and the City of Boston included an implied covenant of good faith and fair dealing.

133.    The covenant of good faith and fair dealing required Mayor Walsh and the City of Boston to refrain from engaging in conduct that would destroy or injure Plaintiff's right to receive the benefits of his contract.

134.    Defendants deprived Plaintiff of the benefits of his contract and breached the implied covenant of good faith and fair dealing through its unlawful conduct described herein.

135.    The City of Boston failed to follow its disciplinary procedure and failed to fully investigate the allegations against Arroyo.

136.    The Plaintiff's termination was against public policy as it sought to punish Arroyo for not resigning his position with the City and his refusal to admit to acts that he did not do. The Plaintiff had the right to defend himself and the right to not admit to things that he did not do.

137.    As a direct and proximate result of the City's breaches of its contract with Plaintiff, Plaintiff suffered injury, harm and damages as described in Count I.

WHEREFORE, Arroyo demands Judgment against the Defendants as follows:

A.  That the Plaintiff be awarded compensatory damages;

B.  That the Plaintiff be awarded attorney's fees, costs of suit, and interest;

C.  And for such other relief as this Court may deem just and proper.


**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

Felix G. Arroyo, Plaintiff

By his Attorney,


/s/ David Summer
David B. Summer, Esq.
BBO# 634514
100 State Street, Suite 900
Boston, MA 02109
Tel: 617-695-0050
Fax: 617-695-0055
david@summerlaw.com


Dated: January 8, 2021


## CERTIFICATE OF SERVICE

I certify that I served the within document upon Defendants' counsel this 23rd day of February 2021, via this Court's CM/ECF filing system.

/s/ David Summer
David B. Summer